548 F.2d 1315
 Fed. Sec. L. Rep. P 95,827, 1 Fed. R. Evid. Serv. 1285
UNITED STATES of America, Plaintiff-Appellee,
v.
Hunter Brooks BRASHIER, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
John Michael COUGHLAN, Sr., Defendant-Appellant.
 Nos. 75-3375, 75-3453.
 United States Court of Appeals,
Ninth Circuit.
 Dec. 29, 1976.
 
 S. Thomas Pollack (argued), of Irell & Manella, Los Angeles, Cal., for appellant in 75-3375.
 Joseph A. Ball (argued), Los Angeles, Cal., for appellant in 75-3453.
 Joel Levine, Asst. U. S. Atty. (argued), Los Angeles, Cal., Andrew D. T. Pfeffer, Asst. U. S. Atty. (argued), Los Angeles, Cal., for appellee.
 OPINION
 Before WRIGHT and TRASK, Circuit Judges, and PALMIERI,* Senior District Judge.
 EUGENE A. WRIGHT, Circuit Judge:
 
 
 1
 Brashier and Coughlan appeal their convictions for criminal violations of the Investment Company Act of 1940 (Act)[1] as the result of illegal concurrent investments. Brashier also appeals a judgment of conviction for filing a false 1971 federal income tax return in violation of 26 U.S.C. § 7206(1).[2]
 
 
 2
 Appellants raise numerous issues on appeal. Finding no reversible error, we affirm.
 
 FACTS
 
 3
 1. The Transaction.
 
 
 4
 Viewing the facts, as we must, in the light most favorable to the government, the jury could have found that the appellants were involved in a complex scheme of illegal simultaneous investments.
 
 
 5
 The Shamrock Fund, a registered investment company under the Act,[3] once was a profitable mutual fund. Organized in 1968 by Robert and Dorothy Wiest, the Fund quickly prospered and its investment portfolio grew to a level of $7.5 million by September 1971.
 
 
 6
 During this time the Lincoln Management Corporation handled the Fund's investment portfolio and operating needs as a management investment company.[4] Lincoln Management's portfolio manager prior to November 5, 1971 was the Fund's founder, Mr. Wiest.[5]
 
 
 7
 His ouster as portfolio manager in November 1971 was precipitated by the increasing financial plight of the Fund. Excessive redemptions, a deteriorating investment portfolio and a past due loan of $1 million were at the heart of Shamrock's difficulties. Within six months the Fund's net asset value plummeted from $7.5 million to $320,000. As a result, in March 1972 Shamrock attained the dubious distinction of becoming the first major mutual fund to enter receivership.
 
 
 8
 Co-defendant Robert Alden Rhoads, lacking investment experience, became Lincoln Management's portfolio manager after Wiest's removal. He was confronted immediately with two pressing, and interrelated, needs. Lincoln Management required an infusion of new funds and Shamrock needed stocks with the potential for rapid appreciation in order to buoy the sagging value of its assets.
 
 
 9
 The needs of Lincoln Management and Shamrock were communicated to Brashier and Coughlan. The stage was set to complete the transition from the Fund's "go-go" mood of the 60's[6] to its hustle of the 70's.
 
 
 10
 Coughlan was a major shareholder and officer in Newport Western, Inc., a large block of whose stock was owned by Shamrock. Aware of Shamrock's and Lincoln Management's financial problems, Coughlan met with Rhoads soon after the latter became the Fund's portfolio manager.
 
 
 11
 Coughlan suggested to Rhoads that Kardar Canadian Oils, Inc. would be a good growth stock for acquisition by Shamrock. He also mentioned that the owner of the Kardar Oil stock might be interested in a concurrent investment in Lincoln Management. Soon thereafter, Shamrock purchased $325,000 in Kardar Oil stock at the same time the President of Kardar Oil invested $80,000 in Lincoln Management.
 
 
 12
 After the Kardar transaction was closed, Coughlan recommended to Rhoads a similar deal involving another growth security, Advance Container Corporation. Rhoads was told that Brashier, the seller of the Advance Container stock, would be willing to make a concurrent investment in Lincoln Management. Brashier was the manager of several limited investment partnerships through his investment company, Pilot Management Corporation.
 
 
 13
 A meeting was arranged among the three principals to discuss the proposed transaction. Brashier promoted the stock at the meeting and Rhoads agreed to purchase, in several installments, Advance Container stock for Shamrock's portfolio. In return Brashier agreed to make a simultaneous investment in Lincoln Management. The instant charges resulted from this transaction.
 
 
 14
 The initial terms of the transaction called for Shamrock to buy 5,500 shares of Advance Container at a price midway between the stock's bid and asked quotations on the over-the-counter (OTC) market. Brashier then was to invest $25,000 of the sale price received from Shamrock in Lincoln Management. The parties also agreed to subsequent similar transactions.
 
 
 15
 The first Advance Container stock transaction was closed at a price of $22 per share. Rhoads ordered the shares through William Anderson of Pacific Western Securities, a broker selected by Brashier. The shares were supplied by Brashier and other persons. Brashier's shares were owned through his nominee, Marcelline Fritts.
 
 
 16
 Payment of the $122,375 purchase price was made by Shamrock to Pacific Western in two installments. Upon receipt of these payments, Anderson, the broker, delivered a cashier's check for $84,375 to Pilot Management Corporation, the company owned by Brashier and in whose name the brokerage account at Pacific Western was held.
 
 
 17
 Thereafter, Brashier instructed his secretary at Pilot Management to purchase four cashier's checks for him. One for $15,000 was payable to Newport Western for payment to Coughlan. A check for $27,250 was made payable to Gerald Azzarone, a business associate of Brashier. A third for $5,000 was payable to another Brashier company, Serendipity Products. Additionally, a sum of $8,625 was wired to another Brashier associate, Alfred Mattei. A fourth check was purchased for $25,000 and made payable to Lincoln Management.
 
 
 18
 Rhoads' testimony at trial indicated that the last check was not a loan, but an investment by Brashier in Lincoln Management as previously agreed upon among the parties. Rhoads further stated that without this payment, he would not have purchased the Advance Container stock.
 
 
 19
 At no time was the SEC notified of this joint transaction involving both Shamrock and Lincoln Management, nor was SEC approval given for such a plan.
 
 
 20
 The Advance Container stock remained in Shamrock's portfolio when it entered receivership in March 1972. Efforts by the receiver to sell it were unsuccessful. Advance Container's bankruptcy in 1973 caused the shares to become virtually worthless.
 
 
 21
 The tax charge against Brashier also stems from the Advance Container stock transaction. Two months prior to it, Brashier asked Marcelline Fritts, his part-time secretary, to act as the nominee owner for some stock he was about to acquire. He explained that he did not wish the shares available to his wife in the event of a divorce. Fritts was told by Brashier that he, not she, would be the actual owner of the Advance Container shares and would be responsible for reflecting their ownership on his tax returns. Fritts agreed.
 
 
 22
 Brashier then obtained 4,400 shares of Advance Container stock at a new offering for $5 per share. The shares were placed in Fritts' name. After their sale to Shamrock for $22 per share, the I.R.S. computed the capital gain realized by Brashier as in excess of $50,000. This figure includes a credit of $25,000 in favor of Brashier from his payment to Lincoln Management. Brashier's 1971 federal income tax return, filed with the I.R.S., failed to reflect any capital gains in 1971 from the sale of Advance Container or any other security.
 
 
 23
 2. The Statute And The Offenses.
 
 
 24
 The offenses, except the related tax charge, arise under the Act, a fundamental purpose of which is to prevent self-dealing on the part of those managing and controlling investment companies and to protect shareholders in the funds from dishonest and self-dealing advisers. The legislation followed a major SEC study of investment trusts and investment companies.[7]
 
 
 25
 The SEC study documented significant problems with insider self-dealing, the use of investment companies as dumping grounds for securities otherwise unmarketable, and the manipulation of portfolios to suit the needs of insiders.[8]
 
 
 26
 The legislative intent of the Act clearly intended to proscribe the kind of illegal scheme among insiders alleged in this case.[9] The transaction was permeated with conflicting interests, an absence of arm's length dealing and opportunities for overreaching.[10]
 
 
 27
 As do the other statutes implementing the federal regulatory scheme with respect to securities, the Act, with the exception of Section 37,[11] contains no specific language to indicate when a proscribed act will constitute a criminal offense. The statute, instead, relies on a "Penalties" section containing three operative provisions.[12]
 
 
 28
 First, a willful violation of any substantive provision, or rule or regulation promulgated under the statute, is a crime. Second, the Act provides a mitigation clause. If the defendant proves he had no actual knowledge of a rule or regulation under the statute then he cannot be convicted under the Penalties section. Third, the statute provides maximum penalties upon conviction.[13]
 
 
 29
 The federal grand jury returned a six-count indictment naming Brashier, Coughlan and Rhoads as defendants.
 
 
 30
 Count One alleged that all defendants conspired to violate the Act by defrauding the Fund, a registered investment company, in violation of 18 U.S.C. § 371.[14]
 
 
 31
 Counts Two through Four alleged substantive offenses under the Act. Count Two charged the three defendants with causing the funds of the Shamrock Fund to be converted to the use of another, 15 U.S.C. § 80a-36 and 18 U.S.C. § 2.[15] The government's theory, in essence, was that the pre-arranged, secret payment by Brashier of $25,000 from the sale of the Advance Container stock back to Rhoads or Lincoln Management constituted a conversion of the Fund's property.
 
 
 32
 Count Three alleged that Rhoads and Shamrock Fund's management company, Lincoln Management, engaged in a three-sided transaction wherein Shamrock and Brashier bought and sold Advance Container stock and Brashier paid $25,000 of the sale price to Lincoln Management. It is a violation of 15 U.S.C. § 80a-17(d)[16] and 17 C.F.R. § 270.17d-1 to effect a joint transaction between "affiliated persons"[17] and the mutual fund with which they are affiliated. Appellants were charged with aiding and abetting the commission of this offense.
 
 
 33
 As affiliated persons of the registered investment fund, Rhoads and Lincoln Management were indicted in Count Four for unlawfully accepting compensation for the purchase of property for the Shamrock Fund from a source other than the regular salary paid by the investment company in violation of 15 U.S.C. § 80a-17(e).[18]
 
 
 34
 Count Five alleged that the three defendants used the means and instrumentalities of interstate commerce and the mails to defraud the Shamrock Fund in connection with the purchase of a security, 5,500 shares of Advance Container, in violation of the antifraud provisions of the Exchange Act of 1934, 15 U.S.C. § 78j(b)[19] and Rule 10b-5, 17 C.F.R. § 240.10b-5.
 
 
 35
 Count Six alleged that Brashier filed a materially false federal income tax return for 1971. The indictment charged that Brashier reported no capital gains for that year when, in fact, he realized a capital gain of approximately $50,000 from the sale of his Advance Container shares.
 
 
 36
 Co-defendant Rhoads pleaded guilty to the conspiracy count prior to trial and was a principal government witness.
 
 
 37
 A jury trial began on August 26, 1975. After the prosecution rested, a motion for judgment of acquittal on Count Five, the 10b-5 violation, was granted as to both appellants. On September 11, 1975, the jury returned guilty verdicts against Brashier and Coughlan as to Counts One through Four. Brashier also was convicted on Count Six, the tax charge.
 
 ISSUES ON APPEAL
 
 38
 1. Motion To Sever.
 
 
 39
 a. Brashier
 
 
 40
 Brashier unsuccessfully moved to sever Count Six, the tax charge, from Counts One through Five, the securities violations, pursuant to F.R.Cr.P. 14.[20] He argues misjoinder of the offenses under Rule 8, F.R.Cr.P.[21]
 
 
 41
 The trial court's denial of Brashier's Rule 14 motion to sever is a determination well within its discretion. The proper standard of review is abuse of discretion. United States v. Campanale, 518 F.2d 352, 359 (9th Cir. 1975), cert. denied, 423 U.S. 1050, 96 S.Ct. 777, 46 L.Ed.2d 638 (1976); United States v. Roselli, 432 F.2d 879, 901 (9th Cir. 1970), cert. denied, 401 U.S. 924, 91 S.Ct. 883, 27 L.Ed.2d 828 (1971).
 
 
 42
 The test is whether joinder is so manifestly prejudicial that it outweighs the dominant concern with judicial economy and compels the exercise of the court's discretion to sever. Campanale, 518 F.2d at 359; United States v. Thomas, 453 F.2d 141 (9th Cir. 1971), cert. denied, 405 U.S. 1069, 92 S.Ct. 1516, 31 L.Ed.2d 800 (1972).
 
 
 43
 Brashier attempts to meet the heavy burden of demonstrating manifest prejudice with three arguments. First, he contends that only the tax count required proof of intent. This is incorrect. The securities violations alleged also required proof of willfulness.
 
 
 44
 Second, Brashier argues that the government's introduction of an unfiled 1971 tax return is unrelated to the $50,000 capital gain which accrued from the Advance Container sale. The unfiled tax return was submitted by Brashier to a local bank to obtain a loan. It indicated a large capital gain not reported on his 1971 return filed with the I.R.S. The evidence is relevant and no prejudice has been shown.
 
 
 45
 Moreover, any possible prejudice could have been cured by a request for a cautionary instruction to the jury to consider the evidence only in connection with the tax count. United States v. Crowder, 464 F.2d 1284 (9th Cir. 1972), cert. denied, 411 U.S. 908, 93 S.Ct. 1537, 36 L.Ed.2d 198 (1973). The defense made no such request.
 
 
 46
 Third, appellant asserts he wanted to testify on his own behalf concerning the tax count only, but that he was precluded from doing so because his prior felony conviction would be used to impeach his testimony. Brashier overlooks the fact that Rule 609(a)(2) permits impeachment in any criminal case where the prior felony conviction, as here, involved "dishonesty or false statement."
 
 
 47
 All the offenses charged are factually related and appellant has not shown that he was so prejudiced by their joinder under Rule 8 that the trial court was required to order a separate trial. See United States v. Ragghianti, 527 F.2d 586, 587 (9th Cir. 1975).
 
 
 48
 b. Coughlan
 
 
 49
 Coughlan contends that the trial court abused its discretion in denying his Rule 14 motions to sever, renewed at trial. The first was to sever his trial from that of Brashier because Brashier would be unavailable as a defense witness in a joint trial. Coughlan's second motion sought a severance and a continuance because of the unavailability of Nicholas Snyder who was under separate indictment with Coughlan on the basis of the Kardar Oil transaction.
 
 
 50
 Rule 8, F.R.Cr.P., embodies a substantial public interest in joint trials of criminal defendants charged with the same offense or as accessories to the same crime. Joint trials are the rule rather than the exception. United States v. Cruz, 536 F.2d 1264, 1267 (9th Cir. 1976); United States v. Camacho, 528 F.2d 464, 470 (9th Cir.), cert. denied, 425 U.S. 995, 96 S.Ct. 2208, 48 L.Ed.2d 819 (1976).
 
 
 51
 The burden rests on the appellant to show that the joint trial was "manifestly prejudicial," Cruz, 536 F.2d at 1268; Camacho, 528 F.2d at 470, and there was an abuse of discretion by the lower court in refusing to sever, Opper v. United States, 348 U.S. 84, 95, 75 S.Ct. 158, 99 L.Ed. 101 (1954).
 
 
 52
 Coughlan fails to meet that burden. Brashier's testimony would not have been exculpatory, but only cumulative of Coughlan's trial testimony and Brashier's testimony before the SEC which was admitted at trial. See United States v. Finkelstein, 526 F.2d 517, 524 (2d Cir. 1975), cert. denied,425 U.S. 960, 96 S.Ct. 1742, 48 L.Ed.2d 205 (1976).
 
 
 53
 Similarly, Snyder's testimony only would have echoed other testimony of meetings with Rhoads about Kardar Oil. Rule 8 seeks to obtain trial economy and efficiency. These goals would be ill-served by severance without the requisite demonstration of manifest prejudice and abuse of discretion below.
 
 
 54
 2. Admissibility Of Brashier's 1971 Unfiled Tax Return.
 
 
 55
 Brashier argues against the admission of a stipulation pertaining to the unfiled 1971 tax return used to obtain a bank loan. The unfiled return indicated a sizable capital gain not reported by Brashier. He raises a relevancy argument under Rule 401, F.R.Ev., and a prejudice contention under Rule 403, F.R.Ev. The gravamen of his assertions is that there was no showing that the net gain listed on the unfiled return related to the sale of the Advance Container stock.
 
 
 56
 The arguments are not persuasive. First, the stipulation was used only in connection with Count Six, tax fraud, and this charge compels a showing of willfulness. Rule 401 speaks in terms of "any tendency" to make the existence of any fact of consequence to the action more probable or less probable.
 
 
 57
 A rule of thumb is to inquire whether "a reasonable man might believe the probability of the truth of the consequential fact to be different if he knew of the proffered evidence." 1 J. Weinstein & M. Berger, Weinstein's Evidence P 401(07), at 401-27 (1975).
 
 
 58
 Appellant's strict definition of relevancy is far too severe. The stipulation was relevant to Brashier's requisite state of mind. Cf. Spies v. United States, 317 U.S. 492, 499, 63 S.Ct. 364, 87 L.Ed. 418 (1943).
 
 
 59
 Also, the stipulation was carefully tailored by the trial court to avoid prejudice under Rule 403. Its potential prejudicial effect did not outweigh its probative value. See United States v. Leonard, 524 F.2d 1076, 1091-92 (2d Cir. 1975), cert. denied, 425 U.S. 958, 96 S.Ct. 1737, 48 L.Ed.2d 202 (1976). No abuse of discretion has been demonstrated by drawing the balance in favor of admissibility.
 
 
 60
 3. Admissibility Of Marcelline Fritts' Testimony.
 
 
 61
 a. Brashier
 
 
 62
 When Marcelline Fritts, part-time secretary to Brashier, was called as a witness in an earlier SEC investigation, Brashier instructed her to say that she knew nothing of his business activities.
 
 
 63
 Her testimony as to those instructions was admitted in this trial and appellant moved for a mistrial on the ground that the SEC investigation related primarily to Unity Capital, another Brashier enterprise, and not to Lincoln Management or Advance Container. Brashier also contends that it constitutes inflammatory and inadmissible character evidence.
 
 
 64
 The Rule 401 standard of relevancy was met. First, 4,400 shares of Advance Container stock were purchased in Fritts' name. The SEC investigation did include an inquiry into Advance Container and Lincoln Management and Fritts was accompanied to this inquiry by an attorney retained and paid by Brashier.
 
 
 65
 Second, the concealment of evidence subsequent to a commission of a crime or evidence of conduct designed to impede a witness from testifying truthfully may indicate consciousness of guilt and should be placed before the trier of fact. See United States v. Cirillo, 468 F.2d 1233, 1240 (2d Cir. 1972), cert. denied, 410 U.S. 989, 93 S.Ct. 1501, 36 L.Ed.2d 188 (1973).
 
 
 66
 In view of the evidence surrounding the dealings in Advance Container stock and other facts properly before the jury, the trial court did not err in admitting Fritts' testimony to indicate Brashier's possible consciousness of guilt.
 
 
 67
 b. Coughlan
 
 
 68
 Coughlan attempts to use Fritts' testimony as a ground for reversal. This is baseless because there was no direct reference in Fritts' testimony to Coughlan. The record reveals that the jury was properly instructed to consider the evidence separately as to each defendant.
 
 
 69
 4. Admissibility of Prior Similar Acts.
 
 
 70
 a. Coughlan
 
 
 71
 Coughlan argues that evidence admitted of prior similar acts was error. Rhoads' testimony established that Coughlan proposed the purchase of shares in Kardar Oil by Shamrock in return for an investment by an officer of Kardar Oil in Lincoln Management.
 
 
 72
 Evidence of prior acts is admissible to demonstrate a defendant's criminal intent if (1) the prior act is similar and close enough in time to be relevant, (2) the evidence of the prior act is clear and convincing and (3) the trial court determines that the probative value of the evidence outweighs any potential prejudice. See, e. g., United States v. Feinberg, 535 F.2d 1004, 1009 (7th Cir. 1976).
 
 
 73
 Under F.R.Ev. 404(b), the evidence of Coughlan's prior similar act was admissible to show his intent in the Advance Container transaction. Spencer v. Texas, 385 U.S. 554, 560-61, 87 S.Ct. 648, 17 L.Ed.2d 606 (1967); United States v. Nichols, 534 F.2d 202, 204 (9th Cir. 1976); United States v. Moore, 522 F.2d 1068, 1079 (9th Cir. 1975), cert. denied,423 U.S. 1049, 96 S.Ct. 775, 46 L.Ed.2d 637 (1976). Moreover, evidence which bears "a common scheme, plan, system, or design" is admissible. Oliphant v. United States, 525 F.2d 505, 507 (9th Cir. 1975), cert. denied, 424 U.S. 972, 96 S.Ct. 1473, 47 L.Ed.2d 740 (1976); United States v. Webb, 466 F.2d 1352, 1353 (9th Cir. 1972).
 
 
 74
 The court soundly exercised its discretion in admitting the evidence. Mindful of its possible prejudicial effect, the trial judge clearly instructed the jury that the prior similar act may only be used to prove knowledge and intent, and not to prove the accused's guilt. See, e. g., United States v. Zeidman, 540 F.2d 314, 319 (7th Cir. 1976); United States v. Kimbrough, 528 F.2d 1242, 1249 (7th Cir. 1976).
 
 
 75
 b. Brashier
 
 
 76
 Appellant Brashier contends that evidence of Coughlan's prior similar act was not admissible as to him. There is no claim that it was.
 
 
 77
 The court stressed throughout the trial that the Kardar Oil transaction did not involve Brashier and it carefully limited the jury's use of the testimony to Coughlan. The trial judge's care in reducing any possible prejudice was bolstered by a cautionary jury instruction on the point. See United States v. Moore, supra.
 
 
 78
 Brashier asserts that the cautionary instruction was ineffective in offsetting the prejudice to him because the jury could not keep Coughlan and Kardar separate from Brashier and Advance Container. No basis has been demonstrated for this assertion.
 
 
 79
 5. Brashier's Prior Conviction.
 
 
 80
 The trial court denied Brashier's motion to exclude evidence of his prior felony conviction (conspiracy to issue unauthorized securities and mail fraud) and to limit cross-examination to the fact of the conviction alone.
 
 
 81
 Appellant first argues that the prior conviction is not evidence of a crime of "dishonesty or false statement" under Rule 609(a)(2), Fed.R.Ev. Consequently, he asserts that the similarity of the present offense and the prior felony conviction makes the evidence unduly prejudicial when the court balances probative value against prejudicial effect under Rule 609(a)(1).
 
 
 82
 A related argument is that this court should follow the District of Columbia Circuit's Luck rule which allows the trial judge to balance the relevance of prior convictions affecting the defendant's credibility against its prejudicial impact, Luck v. United States, 121 U.S.App.D.C. 151, 348 F.2d 763 (1965). The Luck rule has not been adopted in the Ninth Circuit, United States v. Villegas, 487 F.2d 882, 883 (9th Cir. 1973); United States v. Haili, 443 F.2d 1295, 1298 (9th Cir. 1971).
 
 
 83
 The present federal rule 609(a)(1), however, finds its genesis in the Luck doctrine.
 
 
 84
 Brashier's prior conviction falls under the ambit of Rule 609(a)(2) and, therefore, no determination was required to weigh the probative value of the evidence against its prejudicial effect under Rule 609(a)(1).
 
 
 85
 Legislative intent assists us here. The Joint Explanatory Statement of the Conference Committee which accompanied the Federal Rules of Evidence to the floor stated that the terms "dishonesty and false statement" encompassed all offenses:
 
 
 86
 in the nature of crimen falsi, the commission of which involves some element of deceit, untruthfulness, or falsification bearing on the accused's propensity to testify truthfully.
 
 
 87
 The admission of prior convictions involving dishonesty and false statement is not within the discretion of the Court. Such convictions are peculiarly probative of credibility and . . . are always to be admitted.
 
 
 88
 Conference Report on the Federal Rules of Evidence, No. 93-1597, 93rd Cong., 2d Sess., at 4, U.S.Code Cong. & Ad.News 1974, pp. 7098, 7103. See, e. g., United States v. Millings, 175 U.S.App.D.C. 293, 295, 535 F.2d 121, 123 (1976).
 
 
 89
 Crimen falsi at common law included not only charges of falsehood, but also obstruction of justice through the use of fraud or falsehood.[22] Individuals convicted of crimes involving crimen falsi were disqualified from testifying. See Ex parte Wilson, 114 U.S. 417, 5 S.Ct. 935, 29 L.Ed. 89 (1885).
 
 
 90
 Brashier's previous conviction for mail fraud was in the nature of crimen falsi because an element of that offense was intent to deceive or defraud. Cf. Millings, supra.
 
 
 91
 6. Coughlan's Motion For New Trial.
 
 
 92
 Coughlan appeals the denial of his motion for a new trial on the basis of newly discovered evidence. The new evidence relied on by appellant is (1) the testimony of appellant Brashier and (2) the alleged perjury of Rhoads in a separate trial.
 
 
 93
 A significant burden rests on the movant to show an abuse of discretion. United States v. Diaz-Rodriguez, 478 F.2d 1005, 1007 (9th Cir.), cert. dismissed, 412 U.S. 964, 93 S.Ct. 3024, 37 L.Ed.2d 1013 (1973); United States v. Clay, 476 F.2d 1211, 1215-16 (9th Cir. 1973). He must meet these requirements:
 
 
 94
 (1) It must appear from the motion that the evidence relied on is, in fact, newly discovered . . . ; (2) the motion must allege facts from which the court may infer diligence on the part of the movant; (3) the evidence relied on must not be merely cumulative or impeaching; (4) must be material to the issues involved; and (5) must be such as, on a new trial, would probably produce an acquittal.
 
 
 95
 United States v. Cervantes, 542 F.2d 773 (9th Cir. 1976); Pitts v. United States, 263 F.2d 808, 810 (9th Cir.), cert. denied, 360 U.S. 919, 79 S.Ct. 1438, 3 L.Ed.2d 1535 (1959).
 
 
 96
 Brashier's expected testimony was known at the time of trial and argued as part of Coughlan's motion to sever. As previously indicated this testimony would have been cumulative and would not have produced an acquittal.
 
 
 97
 The alleged Rhoads perjury is new evidence, but no showing has been made that any admission or determination of perjury exists. Evidence which may impeach a government witness, although discovered after trial, is not enough without a greater showing that a new trial is required under the standard articulated in Cervantes. See generally United States v. Garner,529 F.2d 962 (6th Cir.), cert. denied, --- U.S. ----, 97 S.Ct. 138, 50 L.Ed.2d 124 (1976); United States v. Stofsky, 527 F.2d 237 (2d Cir. 1975), cert. granted, --- U.S. ----, 97 S.Ct. 66, 50 L.Ed.2d 80 (1976); Casey v. United States, 522 F.2d 206 (5th Cir. 1975), cert. denied, 426 U.S. 909, 96 S.Ct. 2233, 48 L.Ed.2d 834 (1976).
 
 
 98
 7. Jury Instructions.
 
 
 99
 a. Brashier's Capital Gains
 
 
 100
 Count Six charged Brashier with failing to report capital gains from the sale of the Advance Container stock to the Shamrock Fund. After defining gross income, the trial court instructed the jury that, if it found beyond a reasonable doubt that Brashier received a capital gain in connection with the sale of the Advance Container stock, then it was includable as gross income.
 
 
 101
 The government argued to the jury that the stock, in fact, belonged to Brashier and not his nominee, Fritts. Brashier asserts that the jury was denied the opportunity to find there was a capital gain realized. The instructions given show the contrary.
 
 
 102
 Second, appellant contends that the jury first should have determined whether the income derived from the sale was business income as opposed to capital gains. There was no substantial evidence adduced at trial to support appellant's business income theory and the trial court did not abuse its discretion in refusing to give this instruction.b. Intent Instructions
 
 
 103
 Appellants argue there was error in instructing the jury on the substantive counts under the Act. Central to their assignment of error is the contention that the $25,000 payment to Lincoln Management was a legitimate loan rather than a proscribed investment payment. They claim that instructions on these counts required a criminal intent instruction because without them the defendants were subject to strict criminal liability.
 
 
 104
 In particular, much is made by Brashier and Coughlan of Instruction No. 28 on Count IV which provided:
 
 
 105
 A transaction is not legitimate if it tends to bring about preferential treatment in favor of the seller of stock, even though the seller of stock does not intend to influence the affiliated person's acts and even though the affiliated person's acts are not influenced by the payor.
 
 
 106
 The standard to be applied is whether the instructions, taken as a whole, were misleading or represented a statement inadequate to guide the jury's deliberations. United States v. Park, 421 U.S. 658, 673-76, 95 S.Ct. 1903, 44 L.Ed.2d 489 (1975). When viewed as a whole, the trial court's instructions did not allow a finding of strict criminal liability. On the contrary, they fairly advised the jury that intent, i.e., willfulness, was an element of the offenses charged under the Act. The court joined Instruction No. 28 with others which specifically required the jury to find that the acts were willful. See also United States v. Cohen, 518 F.2d 727 (2d Cir. 1975).
 
 
 107
 Appellants confuse instructions on specific intent with those for general intent crimes. The offenses charged here were general intent crimes.[23]
 
 
 108
 The Second Circuit exhaustively researched the basis of criminal prosecutions under the Act in a case of first impression,[24] United States v. Deutsch, 451 F.2d 98 (2d Cir. 1971), cert. denied, 404 U.S. 1019, 92 S.Ct. 682, 30 L.Ed.2d 667 (1972). In Deutsch the court held that a § 17(e) prosecution (Count four here) does not have to prove that the compensation was given with a specific intent to influence the affiliated person. All that is required is to show that the compensation was given and accepted "in appreciation of past, or anticipation of future conduct." Id. at 112.
 
 The court concluded:
 
 109
 The paying of compensation is an evil in itself, even though the payor does not corruptly intend to influence the affiliated person's acts, for it tends to bring about preferential treatment in favor of the payor which can easily injure the beneficiaries of investment companies. . . . We hold that to read into § 17(e)(1) a requirement of intent to influence would frustrate this statutory purpose.
 
 
 110
 Id. at 112-13.
 
 
 111
 Additionally, even a legitimate loan has been held to constitute a violation of § 17(e)(1). United States v. Blitz, 533 F.2d 1329, 1345 (2d Cir. 1976). In Blitz, a $25,000 payment convinced an investment fund to purchase a particular stock. The defendants contended that the $25,000 payment was a loan. The Second Circuit held that, even if it were a loan, the payment was nevertheless a thing of value proscribed by the Act.
 
 
 112
 Appellant's arguments are unpersuasive on the intent instructions for the other substantive counts also. For example, Count Two required only a general intent instruction that the defendants acted purposefully. See SEC v. Commonwealth Securities, Inc., 410 F.Supp. 1002 (S.D.N.Y.1976). As the court commented in Commonwealth Securities: "Conversion, as used in the Act, includes misuse or abuse of property. It also includes use in an unauthorized manner or to an unauthorized extent of property placed in one's custody for limited use." Id. at 1019, citing Tanzer v. Huffines, 314 F.Supp. 189 (D.Del.1970).
 
 
 113
 The jury was properly instructed on the requisite showing of purposeful conduct. The purposeful misconduct of the appellants in using the assets of Shamrock in this unlawful scheme constituted a misuse of assets in violation of the Act, and the jury so found.
 
 
 114
 Appellants further contest the trial court's refusal to give other specific intent instructions. The contentions are meritless. The instructions given were adequate, judged in context and as a part of the whole trial. United States v. Park, supra, 421 U.S. at 674, 95 S.Ct. 1903; Cupp v. Naughten, 414 U.S. 141, 146-47, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973); United States v. Elksnis, 528 F.2d 236, 238 (9th Cir. 1975).
 
 
 115
 We observe that the specific intent instructions given by the lower court on each of the substantive offenses were, if error, overly solicitous of appellants' position. Even so, the jury convicted on the basis of specific intent instructions which placed a greater burden of proof on the government than was necessary. Appellants cannot be heard to complain of the instructions on intent.
 
 
 116
 Finally, appellants assign error to the trial court's instructions on aiding and abetting. Wide latitude is permitted the trial court in jury instructions under the standards we articulated most recently in United States v. Campanale, 518 F.2d 352, 362 (9th Cir. 1975). This discretion was not abused by the instructions given here. By its verdict, the jury found that the government had sustained its burden of proving beyond a reasonable doubt each essential element of aiding and abetting as to each count on which appellants were convicted.
 
 
 117
 AFFIRMED.
 
 
 
 *
 Honorable Edmund L. Palmieri, Senior United States District Judge of the Southern District of New York, sitting by designation
 
 
 [1]
 15 U.S.C. § 80a-1, et seq. (1970)
 
 
 [2]
 26 U.S.C. § 7206 provides that any person who
 "(w)illfully makes and subscribes any return, statement, or other document, which contains or is verified by a written declaration that it is made under the penalties of perjury, and which he does not believe to be true and correct as to every material matter . . . " is guilty of a felony.
 
 
 [3]
 As used in the Act, an "investment company" means any issuer which:
 "(1) is or holds itself out as being engaged primarily, or proposes to engage primarily, in the business of investing, reinvesting, or trading in securities;
 "(2) is engaged or proposes to engage in the business of issuing face-amount certificates of the installment type, or has been engaged in such business and has any such certificate outstanding; or
 "(3) is engaged or proposes to engage in the business of investing, reinvesting, owning, holding or trading in securities, and owns or proposes to acquire investment securities having a value exceeding 40 percentum of the value of such issuer's total assets (exclusive of Government securities and cash items) on an unconsolidated basis."
 15 U.S.C. § 80a-3.
 
 
 [4]
 Mutual funds, generally while under the control of their organizers and original shareholders, enter into contractual fee arrangements with investment companies to provide investment advice. See, e. g., Note, The Mutual Fund and Its Management Company: An Analysis of Business Incest, 71 Yale L.J. 137 (1961)
 
 
 [5]
 This dual role is not unusual. Mutual funds often are incorporated by those who wish to provide it with research and management services for a fee. See Lobell, The Mutual Fund: A Structural Analysis, 47 Va.L.Rev. 181 (1961); Rottenburg, Developing Limits on Compensation of Mutual Fund Advisers, 7 Harv.J.Legis. 309 (1970)
 
 
 [6]
 See, e. g., J. Brooks, The Go-Go Years (1973)
 
 
 [7]
 SEC Investment Trust Study, SEC Report on the Study of Investment Trusts and Investment Companies (1940)
 
 
 [8]
 Id. pt. 3, at 22
 Other widespread abuses included pyramiding, looting, switching and dilution. The gravity and extent of these abuses have been amply demonstrated. See Project, The Mutual Fund Industry: A Legal Survey, 44 Notre Dame L.Rev. 732, 767-68 (1969); Motley, Jackson & Barnard, Federal Regulation of Investment Companies Since 1940, 63 Harv.L.Rev. 1134 (1950); Jaretzki, The Investment Company Act of 1940, 26 Wash.U.L.Q. 303, 307-08, 317-18 (1941); Note, The Investment Company Act of 1940, 50 Yale L.J. 440, 441-42 (1940).
 Potential abuses by investment companies still exist in large numbers. See, e. g., SEC Report on the Public Policy Implications of Investment Company Growth, H.R.Rep. No. 2337, 89th Cong., 2d Sess. (1966).
 
 
 [9]
 See H.R.Rep. No. 2639, 76th Cong., 3d Sess. 9 (1940); S.Rep. No. 1775, 76th Cong., 3d Sess. 6 (1940); Hearings on S. 3580 Before a Subcomm. of the Senate Comm. on Banking and Currency, 76th Cong., 3d Sess. 35-39 (1940)
 
 
 [10]
 SEC Study (1940), supra note 7, at 22
 David Schenker, Chief Counsel of the SEC Study and principal draftsman of the legislation, testified that § 17 was meant to proscribe: "Sit(ting) on both sides of the table when you are dealing with an investment trust." Testimony of David Schenker, Chief Counsel, SEC Study of Investment Trusts, Hearings on S. 3580, supra, pt. 1, at 130-31 (1940).
 
 
 [11]
 15 U.S.C. § 80a-36 provides that:
 "(w)hoever steals, unlawfully abstracts, unlawfully and willingly converts to his own use or to the use of another, or embezzles any of the moneys, funds, securities, credits, property, or assets of any registered investment company shall be deemed guilty of a crime, . . . ."
 
 
 [12]
 15 U.S.C. § 80a-48 states that:
 "Any person who willfully violates any provision of this subchapter . . . or of any rule, regulation, or order hereunder, or any person who willfully in any registration statement, application, report, account, record, or other document filed or transmitted pursuant to this subchapter . . . or the keeping of which is required pursuant to section 80a-30(a) . . . makes any untrue statement of a material fact or omits to state any material fact necessary in order to prevent the statements made therein from being materially misleading in the light of the circumstances under which they were made, shall upon conviction be fined not more than $10,000 or imprisoned not more than five years, or both; but no person shall be convicted under this section for the violation of any rule, regulation, or order if he proves that he had no actual knowledge of such rule, regulation or order."
 
 
 [13]
 Under § 80a-48 of the Act the maximum penalty upon conviction is a fine of "not more than $10,000 or (imprisonment for) not more than five years, or both, . . . "
 
 
 [14]
 18 U.S.C. § 371 reads:
 "If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both."
 
 
 [15]
 18 U.S.C. § 2 provides, in pertinent part:
 "(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal."
 
 
 [16]
 15 U.S.C. § 80a-17(d) provides:
 "(d) It shall be unlawful for any affiliated person of or principal underwriter for a registered investment company (other than a company of the character described in section 80a-12(d)(3)(A) and (B), . . . or any affiliated person of such a person or principal underwriter, acting as principal to effect any transaction in which such registered company, or a company controlled by such registered company, is a joint or a joint and several participant with such person, principal underwriter, or affiliated person, in contravention of such rules and regulations as the Commission may prescribe for the purpose of limiting or preventing participation by such registered or controlled company on a basis different from or less advantageous than that of such other participant."
 
 
 [17]
 The Act, 15 U.S.C. § 80a-2, defines an "affiliated person" as follows:
 "(2) 'Affiliated company' means a company which is an affiliated person. (3) 'Affiliated person' of another person means (A) any person directly or indirectly owning, controlling, or holding with power to vote, 5 per centum or more of the outstanding voting securities of such other person; (B) any person 5 per centum or more of whose outstanding voting securities are directly or indirectly owned, controlled, or held with power to vote, by such other person; (C) any person directly or indirectly controlling, controlled by, or under common control with, such other person; (D) any officer, director, partner, copartner, or employee of such other person; (E) if such other person is an investment company, any investment adviser thereof or any member of an advisory board thereof; and (F) if such other person is an unincorporated investment company not having a board of directors, the depositor thereof."
 
 
 [18]
 15 U.S.C. § 80a-17(e)(1) provides that:
 "(e) It shall be unlawful for any affiliated person of a registered investment company, or any affiliated person of such person
 "(1) acting as agent, to accept from any source any compensation (other than a regular salary or wages from such registered company) for the purchase or sale of any property to or for such registered company or any controlled company thereof, except in the course of such person's business as an underwriter or broker; or . . . "
 
 
 [19]
 15 U.S.C. § 78j(b) provides, in pertinent part:
 "It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange
 "(a) To effect a short sale, or to use or employ any stop-loss order in connection with the purchase or sale, of any security registered on a national securities exchange, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.
 "(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."
 
 
 [20]
 Rule 14 avers that: "If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order . . . separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires."
 
 
 [21]
 Joinder of offenses is permitted if the offenses (1) are of the same or similar character, (2) are based on the same act or transaction, or (3) are based on two or more acts or transactions connected together or constituting parts of a common scheme or plan
 Once joinder is made, three sources of prejudice may arise. First, the jury may confuse and cumulate the evidence. Second, the defendant may be prejudicially confounded in presenting his defenses. Third, the jury may erroneously conclude that the defendant is guilty of one offense and, therefore, convict him on the others because of his criminal disposition. See, e. g., United States v. Foutz, 540 F.2d 733, 736 (4th Cir. 1976); United States v. Ragghianti, 527 F.2d 586, 587 (9th Cir. 1975).
 
 
 [22]
 See, e. g., S. Greenleaf, Evidence § 373 (1842); 2 Wigmore on Evidence § 520 (3d ed. 1940)
 
 
 [23]
 See, e.g., Matthews, Criminal Prosecutions Under the Federal Securities Laws and Related Statutes: The Nature and Development of SEC Criminal Cases, 39 Geo.Wash.L.Rev. 901 (1971); Herlands, Criminal Law Aspects of the Exchange Act of 1934, 21 Va.L.Rev. 139, 145-46, 148-49 (1934)
 Proof of specific intent is not necessary to uphold a conviction for the willful violation of other securities statutes which utilize identical language to that contained in the Act.
 See Securities Act of 1933, § 24, 15 U.S.C. § 77x; Securities Exchange Act of 1934, § 32(a), 15 U.S.C. § 78ff(a); Investment Advisers Act of 1940, § 217, 15 U.S.C. § 80b-17; Trust Indenture Act of 1939, § 325, 15 U.S.C. § 77yyy; Public Utility Holding Company Act of 1935, § 29, 15 U.S.C. § 79z-3.
 See also United States v. Schwartz, 464 F.2d 499 (2d Cir.), cert. denied, 409 U.S. 1009, 93 S.Ct. 443, 34 L.Ed.2d 302 (1972); United States v. Koenig, 388 F.Supp. 670 (S.D.N.Y.1974).
 
 
 [24]
 Little litigation was initiated under the Act after its passage. Eisenberg & Phillips, Mutual Fund Litigation New Frontiers for the Investment Company Act, 62 Colum.L.Rev. 73 (1962). The Deutsch case, more than one quarter of a century after the Act's passage, was the first criminal prosecution brought under it