UNITED STATES of America,
Plaintiff-Appellee,

v.

James Lynn HOOTON,
Defendant-Appellant.

No. 80–1340.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted May 8, 1981.

Decided Nov. 30, 1981.

Charles Peter Diamond, O'Melveny & Myers, Los Angeles, Cal., for defendant-appellant.

John W. Spiegel, Asst. U. S. Atty., Los Angeles, Cal., argued, for plaintiff-appellee; Brad D. Brian, Asst. U. S. Atty., Los Angeles, Cal., on brief.

Before NELSON and NORRIS, Circuit Judges, and THOMPSON,* District Judge.

GORDON THOMPSON, Jr., District Judge.

James Lynn Hooton appeals from his conviction of a single count of engaging in the business of dealing in firearms without a federal license in violation of 18 U.S.C. § 922(a)(1). Hooton was initially tried in January, 1980. The jury was unable to reach a unanimous verdict, and the judge declared a mistrial. Hooton was retried in March, 1980. The jury returned a verdict of guilty, and the court sentenced Hooton to a period of probation.

On appeal Hooton raises several issues. We deal with each seriatim, incorporating the relevant facts into the discussion of each issue.

---

* Honorable Gordon Thompson, Jr., United States District Judge, Southern District of Cali-

## VOLUNTARINESS OF STATEMENTS

In June 1977, Hooton purchased a machine gun from an undercover police officer. During negotiations for the sale, the officer had told Hooton the machine gun was stolen. Hooton was arrested. That night, pursuant to a state search warrant authorized only for daytime service, police officers searched Hooton's apartment for stolen handguns and machine guns. The officers seized approximately 25 index cards listing gun transactions. The local authorities forwarded these records to Special Agent Campbell of the Bureau of Alcohol, Tobacco and Firearms (ATF). Agent Campbell began an investigation of Hooton for possible unlicensed dealing in firearms and other federal firearms violations.

Hooton believed that one Joseph Porrazzo had "set him up" in the undercover machine gun transaction. Porrazzo was a licensed firearms dealer from whom Hooton had obtained many of his guns. Porrazzo was also a potential prosecution witness in the state case against Hooton. Hooton went to law enforcement authorities in an attempt to instigate prosecution of Porrazzo for assorted criminal activities.

In March, 1978, Hooton and his attorney, Michael Luros, contacted ATF Agent Riggs. They arranged an interview to present Hooton's allegations against Porrazzo. Hooton contends that he entered into an immunity agreement with Agent Riggs at the outset of the interview. Under the agreement, Hooton would be an "unindicted coconspirator" in any prosecution of Porrazzo. Following the interview, Agent Riggs ran a routine check on Hooton. He discovered that Hooton was under investigation by another ATF office for illegal gun dealing. Agent Riggs then contacted Agent Campbell to discuss the Hooton investigation.

On April 6, 1978, Agent Riggs arranged another interview with Hooton and his attorney. At this interview, Agent Riggs took a handwriting exemplar from Hooton and asked him questions from a list provid-

fornia, sitting by designation.

ed by Agent Campbell concerning Hooton's gun transactions and use of aliases. At the outset of the April interview, Agent Riggs advised Hooton that he had the right (among others) to remain silent, but that anything he said could be used against him in court. Hooton said he understood those rights. Hooton and his attorney each signed a written waiver which included a declaration that Hooton was answering questions "freely and voluntarily ... without any promise of reward or immunity." This declaration appeared immediately above Hooton's signature.

Hooton brought a motion to suppress his April 6 statements. He contended that the statements were involuntary because he believed his promise of immunity was still in effect at the time of the April interview. The trial court denied the motion. On appeal, Hooton argues that the court applied the wrong legal standard; he contends that the trial court "erroneously concluded that the *Miranda* warnings given to Mr. Hooton precluded him from contesting the admissibility of his statements" and that the court therefore "failed to reach the decisive issue [of] whether under the totality of circumstance, Hooton's statement was 'the product of [his] free and rational choice.'" Hooton urges this court to assess the voluntariness of Hooton's statements by making an independent examination of the record.

However, a review of the record demonstrates that the trial court did not let the fact that Hooton received *Miranda* warnings predetermine its ruling on Hooton's motion to suppress. The trial court denied the motion only after listening to and evaluating the testimony of Hooton, Mr. Luros and Agent Riggs. The court expressly stated that it had considered all the facts and circumstances in reaching its decision on Hooton's motion. Therefore, the trial court's ruling on the voluntariness issue is subject to the "clearly erroneous" standard of review.

Hooton's motion to suppress his statements claimed that Hooton was misled by a promise that he would not be indicted. In denying the motion, the trial court implicitly found Hooton's April 6 statements to be voluntary. The trial court's ruling finds support in the record. The trial court conducted an evidentiary hearing at which both Hooton and his attorney, Mr. Luros, testified. Hooton had orally waived his constitutional rights. He had signed a document which reiterated his waiver of rights and which explicitly stated—directly above the signature line—that Hooton would be answering questions without any promise of immunity.[1] Hooton had signed the written waiver in the presence of Mr. Luros. Mr. Luros had also signed the waiver form. The denial of Hooton's motion to suppress was not clearly erroneous.

### LIVE–WITNESS TESTIMONY

Police seized records of Hooton's gun transactions in June, 1977, while executing a state warrant which the government has conceded was improperly executed at night. These records prompted ATF Agent Campbell to begin investigating Hooton for possible firearms violations. Agent Campbell interviewed a number of witnesses whose names appeared on Hooton's records. He did not show any of the witnesses the documents obtained in the search, and he did not refer to any specific information contained in the documents concerning Hooton's gun transactions. Three of these witnesses—Joseph Bogar, John Koppel and James Trapani—testified for the government. Hooton moved to suppress the testimony of these witnesses. The trial court admitted their testimony under the authority of *United States v. Ceccolini*, 435 U.S. 268, 98 S.Ct. 1054, 55 L.Ed.2d 268 (1978). The court found that specific factors emphasized in *Ceccolini* were present in this case.

---

1. This court agrees with Hooton's position that once the government has granted immunity to a person, if the government later wishes to question that person with a view toward using the answers against him or her, the govern-ment has the responsibility of giving specific notice that the immunity previously granted is being withdrawn. In this case, Hooton received such notice.

In *Ceccolini*, a police officer's illegal search of an envelope in the defendant's flower shop led to the discovery of the key government witness in the defendant's perjury trial. The Court held that the degree of attenuation between the illegality and the testimony was sufficient to dissipate the connection. The Court balanced the benefits of the exclusionary rule against its costs. In applying the rule to live-witness testimony in light of this balance, the Court noted that the following material factors are to be considered: the length of the "road" between the fourth amendment violation and the testimony of the witness at trial; the degree of free will exercised by the witness; and the fact that exclusion of the witness' testimony "would perpetually disable a witness from testifying about relevant and material facts, regardless of how unrelated such testimony might be to the purpose of the originally illegal search or the evidence discovered thereby." *Id.* at 277, 98 S.Ct. at 1061. The Court determined that since the cost of excluding live-witness testimony often will be greater than the deterrent effect such exclusion would have, "a closer, more direct link between the illegality and [live-witness] testimony is required" before a court must exclude such evidence. *Id.* at 278, 98 S.Ct. at 1061.

■ Hooton argues that *Ceccolini* is inapplicable to the live-witness testimony in this case. He first contends that the police officers who searched his apartment were seeking the types of documents that ultimately were turned over to the ATF. Therefore, he argues, the suppression of the testimony would have a significant deterrent effect. However, the search warrant authorized the search of the "rooms, cabinets, and storage areas" of Hooton's apartment for "two stolen handguns, and machine guns, . . . [and] all documents, papers, and items tending to show the person in cont[rol] of the above locations." The warrant did not authorize the seizure of documents relating to Hooton's ownership of various firearms as Hooton asserts. The district court found that the local authorities did not conduct the search in order to obtain evidence of the federal firearms offense with which Hooton was charged. This finding is not clearly erroneous. Thus, as in *Ceccolini*, suppression of the testimony in this case would not have had an appreciable deterrent effect.

Hooton also argues that few, if any, attenuating factors are present in this case. He asserts that the path from the illegal search to the development of testimony was straight and uninterrupted: the illegally-seized material prompted the federal investigation and identified potential witnesses. He further argues that the witnesses did not testify voluntarily; their appearance at trial was compelled by subpoena.

■■ In determining whether a significant attenuation between police misconduct and live-witness testimony exists, the court must assess the effect of the search on the exercise of the witness' free will. Where police misconduct did not induce the witness' cooperation, the testimony will not be suppressed even though the unreasonable intrusion was one step in a series of events that led to the witness testifying. *United States v. Leonardi*, 623 F.2d 746, 752 (2d Cir.), *cert. denied*, 447 U.S. 928, 100 S.Ct. 3027, 65 L.Ed.2d 1123 (1980). The court should consider: (1) the stated willingness of the witness to testify; (2) the role played by the illegally-seized evidence in gaining the witness' cooperation; (3) the proximity between the illegal behavior, the witness' decision to cooperate and the actual testimony at trial; and (4) the police motivation in conducting the search. *Id.*

In the present case, the trial court found that tainted evidence from the search was not used to coerce or induce the testimony of the witnesses. The witnesses "[had] an opportunity to think over their responses and then they opted to talk and make statements to the investigators in the case." In interviewing the witnesses, the investigating agents made no specific reference to the material that was discovered in the search; the documents were not shown to prospective witnesses to refresh their recollection or to pressure them to make statements. The illegally-seized evidence played no part in securing the witnesses' cooperation.

The trial court noted that most of the initial interviews with the witnesses took place several months after the search; the testimony at trial took place almost three years after the search. As set forth earlier, the police conducted the search to obtain stolen firearms and documents that would show who controlled the areas searched. They were not searching for evidence of federal firearms offenses. Thus, the trial court's refusal to suppress the testimony is supported by three of the four factors enumerated in *Leonardi*.

Hooton challenges the willingness of the witnesses to testify. He argues that two witnesses were reluctant to cooperate with the ATF: Koppel had "deep [anti-ATF] feelings about firearms registration"; Trapani was reluctant to discuss the case until reassured that the investigator was not seeking information for use in the state prosecution pending against him and Hooton. However, despite the possible initial reservations of these witnesses, the trial court found that they made "free and voluntary" statements "after sufficient reflection."

Hooton also attempts to distinguish *Ceccolini* by suggesting that *Ceccolini* applies only to "good-citizen" witnesses who are testifying "out of civic duty." However, this court will not impose such a limitation. *See United States v. Leonardi*, 623 F.2d at 750, 752 (unindicted coconspirator testifying pursuant to a plea bargain); *United States v. Brookins*, 614 F.2d 1037, 1043 (5th Cir. 1980) (testimony partially induced by a grant of immunity); *United States v. Stevens*, 612 F.2d 1226, 1229 (10th Cir. 1979), *cert. denied*, 447 U.S. 921, 100 S.Ct. 3011, 65 L.Ed.2d 1113 (1980) (coconspirator testified pursuant to plea bargain). *Cf. United States v. Scios*, 590 F.2d 956 (D.C.Cir.1978) (en banc) (testimony given solely to avoid being jailed for contempt not sufficiently an act of free will to purge the primary taint). The trial court properly admitted the testimony under *Ceccolini*.

## VINDICTIVE PROSECUTION

Hooton contends that the trial court should have dismissed the indictment on the ground that he was the subject of vindictive prosecution. Hooton asserts that Agent Campbell caused the United States Attorney's office to seek a federal indictment in order to retaliate against Hooton for filing various civil actions against Agent Campbell and the government. The indictment was returned in July, 1979. Hooton's civil actions consisted of an administrative tort claim filed in May, 1978, with the Department of the Treasury and two lawsuits filed in state and federal court.[2] Hooton also contends that Agent Campbell was "angered" by Hooton's charges against Agent Campbell's "close friend", Joseph Porrazzo. Agent Campbell denied these allegations in his testimony at the motion hearing. He further testified that the existence of the administrative tort claim did not affect his actions, that he never urged the United States Attorney's office to prosecute Hooton (although he recommended prosecution) and that he never expressed disappointment at the delay in reaching a prosecutive decision. The district court denied Hooton's motion to dismiss the indictment.

Hooton has labeled his claim one of "vindictive" prosecution and argues that the standard set forth for vindictive prosecution cases should govern this issue. This standard provides that the mere appearance of vindictiveness gives rise to a presumption of a vindictive motive; the burden is then shifted to the prosecution to show that independent reasons or intervening circumstances dispel the appearance of vindictiveness and justify its decisions. A claim of vindictive prosecution usually arises when the government increases the severity of alleged charges—for example, by re-indicting a defendant—in response to the exercise of constitutional or statutory rights.

**2.** The Treasury denied the tort claim. Hooton abandoned that claim by allowing the appeal period to lapse. The federal complaint was served in November, 1979; Agent Campbell learned of the state court suit in December, 1979—four months after the indictment was returned in July 1979.

*United States v. Motley*, 655 F.2d 186 (9th Cir. 1981); *United States v. Burt*, 619 F.2d 831 (9th Cir. 1980); *United States v. Griffin*, 617 F.2d 1342 (9th Cir.) *cert. denied*, 449 U.S. 863, 101 S.Ct. 167, 66 L.Ed.2d 80 (1980); *United States v. Ruesga-Martinez*, 534 F.2d 1367 (9th Cir. 1976). This line of cases stems from two Supreme Court cases: *North Carolina v. Pearce*, 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969) (trial court's reasons for imposing heavier sentence upon retrial must affirmatively appear) and *Blackledge v. Perry*, 417 U.S. 21, 27, 94 S.Ct. 2098, 2102, 40 L.Ed.2d 628 (1974) (extended rule in *Pearce* to protect accused against apprehension of prosecutorial vindictiveness: indictment on increased charges violates due process when the circumstances "pose a realistic likelihood of 'vindictiveness' ").

■ The government argues that since Hooton is challenging the initial filing of the indictment, the standard for claims of "selective" or "discriminatory" prosecution should apply. Under this standard, the defendant has the burden of demonstrating (1) that others similarly situated generally have not been prosecuted for similar conduct and (2) that his selection for prosecution was based on an impermissible ground such as race, religion or his exercise of his right to free speech. *United States v. Erne*, 576 F.2d 212 (9th Cir. 1978); *United States v. Scott*, 521 F.2d 1188 (9th Cir. 1975), *cert. denied*, 424 U.S. 955, 96 S.Ct. 1431, 47 L.Ed.2d 361 (1976).

■■ This court holds that the mere filing of an indictment can support a charge of vindictive prosecution. However, in this case, the government has shown that the only alleged animus was that of Agent Campbell, who had no charging authority. Hooton failed to show even an appearance of vindictiveness on the part of those members of the United States Attorney's office who made the prosecutive decision. The record supports the trial court's denial of Hooton's motion to dismiss the indictment.

## EVIDENCE OF OTHER ACTS UNDER FED.R.EVID. 404(b)

Federal Rule of Evidence 404(b) states: Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Hooton argues that the trial court erred in allowing the government to present evidence of three acts for which he had not been charged: 1) firearm sales made prior to the indictment period; 2) a business arrangement between Joseph Porrazzo and Hooton in which Hooton ordered guns through Porrazzo for a share of the profits upon resale in Porrazzo's shop; and 3) Hooton's involvement in assisting Porrazzo to distribute guns received from Eric Linder.

The government relied in pretrial submissions and during trial on two permissible uses of other act evidence to establish intent and to demonstrate a common scheme or plan. Hooton argues that intent was not a material issue in the case because his defense was that the "nature and quantum of his gun-related activities were insufficient to prove him to be a dealer." Hooton argues further that the evidence of other acts was "wholly unrelated" to the transactions for which he was tried and thus cannot be admissible as part of a common scheme or plan. The government argues that the evidence of other acts was relevant to show that Hooton acquired guns for the purpose of selling them, not for the purpose of collecting them.

■ The determination of admissibility under Rule 404(b) rests in the discretion of the trial judge. *See United States v. Martin*, 599 F.2d 880, 889 (9th Cir.), *cert. denied*, 441 U.S. 962, 99 S.Ct. 2407, 60 L.Ed.2d 1067 (1979); Fed.R.Evid. 404(b), Note of Advisory Committee on Proposed Rules ("No mechanical solution is offered. The determination must be made whether the danger of undue prejudice outweighs the probative value of the evidence in view of the availa-

bility of other means of proof and other factors appropriate for making decisions of this kind under Rule 403."). The Ninth Circuit has set out a three-part test for determining the admissibility of other act evidence to prove intent under Rule 404(b):

1) the prior act is similar and close enough in time to be relevant,

2) the evidence of the prior act is clear and convincing, and

3) the probative value of the evidence outweighs any potential prejudice. *United States v. Bronco*, 597 F.2d 1300, 1302–03 (9th Cir. 1979); *United States v. Brashier*, 548 F.2d 1315, 1325 (9th Cir. 1976), *cert. denied*, 429 U.S. 1111, 97 S.Ct. 1149, 51 L.Ed.2d 565 (1977).

 In this case, Hooton is charged with engaging in the business of gun dealing without a license. Thus, evidence of his intent to engage in business as opposed to an intent merely to enhance his gun collection was an essential part of the government's proof. *United States v. Angelini*, 607 F.2d 1305, 1309–11 (9th Cir. 1979) (evidence of scienter properly admitted in prosecution of gun dealer asserting "collector" defense). Moreover, even in general intent crimes, the government can offer evidence of other acts as part of its case-in-chief when it is obvious that the defense will raise lack of intent as a defense. *United States v. Hearst*, 563 F.2d 1331, 1337–38 (9th Cir. 1977), *cert. denied*, 435 U.S. 1000, 98 S.Ct. 1656, 56 L.Ed.2d 90 (1978). In this case, it was obvious that Hooton would raise lack of intent as a defense. Hooton had relied on a "collector" defense at the first trial which had resulted in a hung jury, and Hooton's opening statement at the second trial presented the theme that his transactions were exclusively motivated by his collecting interests. The other acts took place immediately preceding or contemporaneous with the indictment period. The other acts were the same type of transactions—gun sales—as the charged crime. The evidence of these other acts was highly relevant to determine Hooton's intent. Apart from the probative value in establishing Hooton's motivation or intent, these

gun sales were not significantly prejudicial. An individual gun sale is not a crime in itself, unless it is part of an overall pattern of unlicensed gun dealing.

The evidence of the prior acts was clear and convincing. The existence of the Hooton-Porrazzo business arrangement was established by stipulation. During the tape-recorded April 6 interview with Agent Riggs, Hooton admitted receiving guns from Porrazzo who received them from Eric Linder's dealership. Hooton played an active role in the distribution of the Linder guns. At the pretrial hearing, Hooton failed to attack the evidence of the gun sales outside the indictment period but rather attacked the relevancy and possibility of prejudice in allowing this evidence.

 The trial court properly instructed the jury that the evidence of other acts could be used to determine intent but could not be used to determine whether the accused committed any act alleged in the indictment. The trial court also properly instructed the jury that "where proof of an alleged similar act done at some other time or place is clear and conclusive, the jury may, but is not obliged to, draw the inference and find that in doing the act charged in the indictment the accused acted willfully and not because of mistake or accident or other innocent reason."

The trial court did not abuse its discretion in admitting the evidence of other acts under Fed.R.Evid. 404(b).

## EXCLUSION OF EVIDENCE CONCERNING FREQUENCY AND NUMBER OF GUN TRANSACTIONS ENGAGED IN BY TYPICAL HOBBYIST COLLECTORS

Hooton contends that he attempted to provide the jury with an objective measure of the level of trading by a typical hobbyist collector against which his conduct could be measured, citing *United States v. Van Buren*, 593 F.2d 125, 126 (9th Cir. 1979) ("[T]he record establishes Van Buren's willingness to trade or sell firearms, the profitability of his transactions, and the fact that his activity was greater than the occasional sales

normally entered into by a hobbyist."). Hooton attempted to offer the evidence through the testimony of gun collectors, of gun dealers who cater to hobbyists and of ATF Agents who enforce the gun laws. Hooton argues that the trial court erred in rebuffing each of these attempts. The trial court excluded the evidence with the admonition that only Hooton was on trial. However, defense counsel did elicit extensive testimony from approximately twenty prosecution and defense witnesses concerning the activities of gun collectors.

Federal Rule of Evidence 403 provides in part: "Although relevant, evidence may be excluded if its probative value is substantially outweighed . . . by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

Rule 403 confers broad discretion on the trial judge. *United States v. Hearst*, 563 F.2d at 1348–49. The trial judge's ruling on excluding evidence on the ground that it would create undue delay, waste time, or needlessly present cumulative evidence should be reversed only if the decision constitutes an abuse of discretion. *See Id.* at 1349; *Hamling v. United States*, 418 U.S. 87, 127, 94 S.Ct. 2887, 2912, 41 L.Ed.2d 590 (1974) ("The District Court retains considerable latitude even with admittedly relevant evidence in rejecting that which is cumulative, and in requiring that which is to be brought to the jury's attention to be done so in a manner least likely to confuse that body. We agree with the Court of Appeals that the District Court's discretion was not abused.").

In this case, the excluded evidence was marginally relevant. However, extensive testimony was admitted on the activities of gun collectors. The trial judge allowed Hooton to make his offer of proof and then exercised his authority to prevent needless presentation of cumulative evidence. The trial judge properly exercised his discretion in excluding the evidence under Rule 403.

## ALLEN CHARGE

After six days of evidence and argument, the jury began its deliberations on March 12, 1980. The jury continued deliberating throughout the next day, twice asking for further instructions. On March 13, the jury announced it was deadlocked. The next morning, the trial judge delivered an *Allen* charge. Early that afternoon, the jury returned a verdict of guilty.

Hooton argues that the use of the *Allen* charge was coercive. He cites one of the juror notes of March 13 that stated "Please send us home. Some of us have family obligations, i. e., children at home alone."

The Ninth Circuit has in "countless cases" approved an *Allen* charge. *E. g., United States v. Beattie*, 613 F.2d 762, 764 (9th Cir.), *cert. denied*, 446 U.S. 982, 100 S.Ct. 2962, 64 L.Ed.2d 838 (1980). To determine the propriety of the trial court's use of the *Allen* charge, this court must examine the instruction "in its context and under all the circumstances" to see if it had a coercive effect upon the jury. *Id.* (quoting *Jenkins v. United States*, 380 U.S. 445, 446, 85 S.Ct. 1059, 1060, 13 L.Ed.2d 957 (1965)).

Unlike *United States v. Contreras*, 463 F.2d 773 (9th Cir. 1972), in which the trial court gave the jury an *Allen* charge after nearly eight hours of deliberation and prior to any indication in the record that the jury was unable to reach a verdict, this case does not involve a premature *Allen* charge. The *Allen* charge in this case was delivered on the third day of deliberations after the jury notified the judge that it was deadlocked.

The Ninth Circuit in *Beattie* relied on four factors to determine that the use of the *Allen* charge in that case was not coercive:

1) The form of the instruction;

2) The period of deliberation following the *Allen* charge;

3) The total time of jury deliberations; and

4) The indicia of coerciveness of pressure upon the jury.

The first three factors support the use of the *Allen* charge in this case—1) the charge given by the trial judge was from 1 E. Devitt & C. Blackmar, *Federal Jury Practice and Instructions* § 18.14 (3d ed.

1977); 2) as in *Beattie*, the jury received the *Allen* charge in the morning and returned the verdict in the afternoon, whereas the jury in *Contreras* returned its verdict thirty-five minutes after receiving the *Allen* charge; 3) the jury reached a verdict on the afternoon of the third day of its deliberations after a six-day trial; the jury in *Beattie* reached a verdict on the third day of deliberation after a four-day trial. ·

Finally, the record reveals no indicia of coerciveness or pressure upon the jury. The trial judge was unaware of how the jury stood, he gave the *Allen* charge only once, and he avoided coercive deadlines or threats. The "child care" request, when taken in context, reveals no "atmosphere of judge and jury frustration over a jury's inability to break the deadlock." 613 F.2d at 776. Rather, the request was made at 5:30 p. m. on the second day of deliberations, and the jury was excused at 5:40 p. m. until the next court session.

The trial judge acted within his discretion in giving the *Allen* charge in this case.

### CONCLUSION

Hooton's conviction is affirmed in all respects.