840 F.2d 18
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
David A. CRABTREE, Defendant-Appellant.
 Nos. 87-5747, 87-5748.
 United States Court of Appeals, Sixth Circuit.
 Feb. 29, 1988.
 
 E.D.Tenn.
 AFFIRMED.
 On Appeal from the United States District Court for the Eastern District of Tennessee.
 Before DAVID A. NELSON and BOGGS, Circuit Judges, and GEORGE CLIFTON EDWARDS, Jr., Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 Adopting a magistrate's report and recommendation, the United States District Court for the Eastern District of Tennessee denied defendant David A. Crabtree's motion to dismiss a superseding indictment and his motion to suppress evidence. The court held that the indictment was not barred by a plea agreement and that statements of Mr. Crabtree that were the subject of the motion to suppress had not been elicited in violation of Miranda v. Arizona, 384 U.S. 436 (1966). Finding that the magistrate's factual determinations were supported by substantial evidence and that his legal conclusions were correct, we shall affirm the order denying the motions.
 
 
 2
 * Mr. Crabtree was indicted on four counts of bankruptcy fraud. He then entered into a plea agreement in which he acknowledged involvement in bank fraud and other crimes for which he had not been indicted. The agreement contained the following provisions, among others:
 
 
 3
 "A.
 
 
 4
 3. Defendant Crabtree is aware that he may be compelled to testify in grand jury or other judicial proceedings, and if so compelled, agrees that his testimony will be complete and truthful. Defendant Crabtree further agrees that any records or documents under his control will be turned over when called for in any judicial proceeding or official inquiry and that defendant Crabtree agrees to advise of the location of any documents of which he is aware which are relevant to any judicial proceeding or official inquiry.
 
 
 5
 * * *
 
 
 6
 * * *
 
 
 7
 8. Defendant agrees that any failure on his part to comply with the above listed paragraphs 1 through 7 will result in termination and abrogation of this agreement and result in the consequences listed in Section C of this plea agreement.
 
 
 8
 * * *
 
 
 9
 * * *
 
 B.
 
 10
 1. The United States will not prosecute defendant Crabtree for bank fraud and other crimes occurring prior to this plea agreement which are now under investigation by the United States government or disclosed by defendant Crabtree pursuant to this agreement.
 
 
 11
 * * *
 
 
 12
 * * *
 
 C.
 
 13
 The consequences of the breach of this agreement by the defendant Crabtree are as follows:
 
 
 14
 * * *
 
 
 15
 * * *
 
 
 16
 2. Defendant Crabtree can be prosecuted on any other criminal offense occurring before or after this plea agreement, including those which he makes known to the United States pursuant to this agreement, and including those offenses which the United States pursuant to this agreement has agreed not to prosecute.
 
 
 17
 3. Any statement or testimony of defendant Crabtree in any form even if given pursuant to immunity and compulsion can be used in any prosecution by the United States against him."
 
 
 18
 After pleading guilty to the four counts of bankruptcy fraud pursuant to the agreement, and before he began to serve the prison term to which he was sentenced, Mr. Crabtree arranged with one Dee Proffitt for Proffitt to receive a substantial amount of money from C.H. Butcher, III. The transfer was to be made on behalf of Mr. Crabtree's young son. Mr. Butcher is the son of C.H. Butcher, Jr., who had been indicted along with Mr. Crabtree.
 
 
 19
 In November of 1984, C.H. Butcher, Jr.--the father--visited Mr. Proffitt and delivered to him United States treasury bonds and/or notes in the amount of $1,250,000.00, plus some $50,000.00 in treasury coupons. Later that month Mr. Crabtree called Proffitt and talked to him about cashing the bonds and coupons. Mr. Proffitt was not eager to do that, but he subsequently arranged to have some of them cashed or sold.
 
 
 20
 In May of 1985, suspecting that the securities belonged to the elder Butcher, Mr. Proffitt acted to extricate himself from the situation by turning over to Crabtree's wife the remaining bonds and coupons and the cash that had been received to that point for securities Mr. Proffitt had previously turned over to an accountant to be negotiated.
 
 
 21
 A few weeks earlier, three agents of the IRS had gone to the federal penitentiary at Lexington, Kentucky, to confer with Mr. Crabtree in connection with their ongoing investigation into the bank fraud. The IRS had been alerted to Crabtree's willingness to talk by two of Mr. Crabtree's fellow inmates. At a hearing before a magistrate, Crabtree subsequently testified that first these prisoners and then the agents promised him that if he cooperated with the IRS, he would not be prosecuted further. One of the agents contradicted Crabtree, testifying that no immunity was promised. Most of the conversation between Mr. Crabtree and the agents was taped, and a transcript of it corroborates the agent's version:
 
 
 22
 "Q [agent]. Did anybody ever mention to you immunity from us?
 
 
 23
 A [Crabtree]. Yes, MIKE--[reference to Mike Strauss--a fellow inmate with defendant].
 
 
 24
 Q. Immunity, DAVID, immunity?
 
 
 25
 A. Immunity, yes, immunity. And I do need that because what I've already sent you is incriminating. What else I have--the additional information I've prepared is incriminating and if I ever have a problem in Tennessee and they try to screw with my immunity, I don't want ever [sic] have to question you guys that I'm immune, if I do work--you know if you do want me to work with you.
 
 
 26
 Q. Yeah, the point is, they've given you immunity. Nobody's ever told you that we would give you immunity. At least, I haven't.
 
 
 27
 A. No, nobody's told me, I--
 
 
 28
 Q. That's what I want to get, you know, out of you. I want to know what you've been told up to now and what you haven't been told. You haven't been told anything about immunity.
 
 
 29
 A. No, sir. In fact, when you were reading me my rights. I said, I guess it's okay for me to go on because I do have immunity from Tennessee to take me so far, and I'll only go so far."
 
 
 30
 Crabtree testified, however, that at times the tape recorder was turned off and during those times the agents promised him immunity.
 
 
 31
 In September of 1985, while Crabtree's wife still had possession of the securities and cash, Mr. Crabtree appeared before a grand jury and testified about the initial acquisition of the securities and a conversation with C.H. Butcher, Jr., concerning their status:
 
 
 32
 "Q And, during the course of that talk with him, did he indicate to you what had happened to the bonds and coupons that you had delivered to him back in '83, what he had been doing with them?
 
 
 33
 A Yes, well, keep in mind there is two blocks of those things. So, when I'm discussing with him, I assume we are talking about both blocks. You were trying to be specific about one block, but the conversation I had pertained to both blocks. So it's natural in a conversation you don't differentiate between the two.
 
 
 34
 Q All right, now when you say both blocks, you are talking about the 1979/1980 block and the 1982 block we just discussed, is that right?
 
 
 35
 A Right.
 
 
 36
 Q Okay, tell us in your own words what Mr. Butcher indicated to you had happened with the bonds and coupons in the intervening time since you turned over possession to him?
 
 
 37
 A He said that he had been running the coupons through the Union County Bank and that Tim Ellis had been keeping copies of the transactions, Tim Ellis being president of the bank, copies of the tickets, coupons or whatever but somehow he had kept a record of what was going through the bank and had, I guess the end of '84 sent a 1099 to the I.R.S. for some two hundred thousand dollars assessing his father with that income and said he had a hell of a problem with the bond situation and with the coupons--excuse me, with the coupons, he said he had handled the bonds which I understood him to mean he had sold the bonds. Coupons being a separate item, he said he had a hell of a problem with the coupons, that the bonds were handled and he had used those funds for something else.
 
 
 38
 Q Did he indicate to you what he had used the funds for as related to the bonds?
 
 
 39
 A Real estate project in--real estate projects, one he mentioned in Miami or Orlando, something he was in with Earl Wilson, a subdivision which didn't mean anything to me. I wasn't familiar with the deal and he alluded to some other real estate transactions."
 
 
 40
 He did not tell the grand jury that the remaining bonds and coupons were then in the possession of his wife.
 
 
 41
 On April 1, 1986, Mr. Crabtree's wife approached the FBI and turned over the bonds, coupons and cash. The next day, an FBI agent telephoned Crabtree, who started to explain what had happened to the property. The agent testified without contradiction that he immediately stopped Crabtree from explaining, took no notes on the attempted explanation, and agreed to travel to the penitentiary and meet with Crabtree personally. On April 3, 1986, the agent met with Crabtree, gave him the warnings mandated by Miranda, and interviewed him about the bonds, coupons and cash. During this meeting Crabtree signed a waiver indicating that he understood his Miranda rights and was talking voluntarily.
 
 
 42
 Based on these events, the government filed a superseding indictment, and Crabtree pleaded guilty to the charges against him conditioned on the outcome of this appeal.
 
 II
 
 43
 Before pleading guilty, Crabtree moved to dismiss the superseding indictment, arguing that it violated his plea agreement with the government. He contends that he did not violate the agreement, and that if he did, the government did not proceed properly to strip him of his immunity.
 
 
 44
 In assessing Mr. Crabtree's contentions, we may not disturb the magistrate's factual findings if they are supported by substantial evidence. United States v. Lambert, 771 F.2d 83, 89 (6th Cir.), cert. denied, 474 U.S. 1034 (1985); see United States v. Wood, 780 F.2d 929, 932 (11th Cir.), cert. denied, 107 S.Ct. 97 (1986).
 
 
 45
 Crabtree argues that he gave complete and truthful testimony as required by the plea agreement. This argument is without merit. As the magistrate found, and as the quoted portion of the testimony reveals, "his testimony left the grand jury with the impression that this million dollar block of bonds had been disposed of by C.H. Butcher, Jr., yet at the very moment he was giving this testimony he was in possession and in control of [the securities and their cash proceeds]." Crabtree contends that the question whether this testimony violated the plea agreement should be resolved under the standard used to determine whether grand jury testimony is perjurious. We disagree. Crabtree agreed to testify completely and truthfully. When Crabtree failed to testify that his wife had possession of the bonds and coupons, he violated his agreement to testify completely.
 
 
 46
 The magistrate found that Crabtree also violated the obligation he assumed under the plea agreement to disclose the location of relevant documents. Crabtree argues that the bonds were akin to cash, and thus did not constitute "documents." We think the securities were "documents," just as any debt instrument is a document.
 
 
 47
 Crabtree next argues that under the plea agreement the government could not withdraw his immunity unless it first gave him a lie detector test. His construction of the plea agreement is without merit. The provision to which he refers merely gives the government the right to demand a lie detector test if it wishes.
 
 
 48
 Crabtree urges us to set aside the magistrate's findings because the magistrate made his findings of fact under a "preponderance of the evidence" standard rather than a "clear and convincing" standard. There is no mention in the magistrate's report and recommendation of the standard used. The Court of Appeals for the Seventh Circuit, however, has held that a preponderance of the evidence standard applies in a situation such as that before the magistrate. United States v. Verrusio, 803 F.2d 885, 894 (7th Cir.1986). We agree. Moreover, Crabtree did not raise this point below, either before the magistrate or in his objections to the magistrate's report. Accordingly, he has waived the argument. Thomas v. Arn, 474 U.S. 140 (1985).
 
 
 49
 Similarly, Crabtree advances on appeal for the first time the arguments that when he gave his testimony he was not "under compulsion," as required by the plea agreement, and that the government waived any breach of the plea agreement by continuing to use him for investigative and testimonial purposes after the breach. Mr. Crabtree did not make these arguments to the magistrate or the district court, and thus is precluded from relying on them here.
 
 
 50
 Crabtree argues that even if he did violate the plea agreement, he could not be prosecuted because he had equitable immunity arising from the "promises" of either the IRS agents or of the prisoners who spoke to him on behalf of the agents before the interview at the prison. After weighing the conflicting testimony of one of the agents and of Crabtree about their conversation, and considering the transcript of those portions of the conversation that were recorded, the magistrate determined that there had been no promise of additional immunity to Crabtree. If the prisoners had made any promises, moreover, Crabtree could not reasonably have relied on them in light of the agent's subsequent disclaimer of immunity. These findings are not clearly erroneous, and they defeat Crabtree's claim of equitable immunity.
 
 III
 
 51
 Before pleading guilty, Mr. Crabtree also moved to suppress the use of statements given by him to the FBI agent with whom he met on April 3, 1986. The magistrate found that no statements were made to the agent before the April 3 meeting, and it is undisputed that Crabtree was given his Miranda warnings before talking to the agent on the third. Accordingly, Crabtree was not entitled to suppression under Miranda.
 
 
 52
 Crabtree constructs an additional argument based upon dicta in a footnote of a Ninth Circuit decision to the effect that before a defendant who has pleaded guilty pursuant to a plea agreement may be questioned by the government with an eye toward using the answers against the defendant, the government must give notice to the defendant that his immunity is to be withdrawn. See United States v. Hooten, 662 F.2d 628, 631 n. 1 (9th Cir.1981), cert. denied, 455 U.S. 1004 (1982). For the purposes of argument, the magistrate accepted this proposition. The magistrate found that there was no intent at the time of the meeting to use Crabtree's statements against him, nor was there a decision as to whether immunity would be withdrawn. This finding is supported by the record.
 
 
 53
 The order denying Mr. Crabtree's pretrial motions is AFFIRMED.