975 So.2d 1235 (2008)
David E. WELLS, Appellant,
v.
STATE of Florida, Appellee.
No. 4D06-4151.
District Court of Appeal of Florida, Fourth District.
March 12, 2008.
*1236 Carey Haughwout, Public Defender, and Dea Abramschmitt, Assistant Public Defender, West Palm Beach, for appellant.
Bill McCollum, Attorney General, Tallahassee, and Heidi L. Bettendorf, Assistant Attorney General, West Palm Beach, for appellee.
GROSS, J.
After he was illegally stopped, David Wells disclosed information to a detective that the police pursued along a short but twisty investigatory road until they found a crucial witness who turned physical evidence over to them and later testified at trial. We hold that the evidence derived from this witness was sufficiently attenuated from the illegal stop, so that the trial court did not err by permitting the jury to see and hear it.
Shortly after midnight on September 21, 2004, Louie Allen went to a bank ATM to withdraw $240. As the money came out of the machine, Allen saw a black man with a butcher knife. The man wore a maroon tee shirt and sneakers; he had a plastic hat on his head, like a shower cap. The man said, "I'll take all of that." Allen told the man to get the money himself and backed away from the ATM. The man grabbed the cash, turned, and sprinted around the side of the building. Allen called the police. In addition to the clothing description, Allen said the assailant was 25-32 years old, 5 feet 11 inches tall, and about 152 pounds.
One hour later, Officer Oscar Dominguez observed a black man "roughly matching the physical description" of the assailant, but wearing different clothing. As officers approached, the man fled. The police set up a perimeter, but did not find him.
Two hours later, the police saw a car occupied by two black men in the general area of the bank ATM. David Wells was in the passenger seat of the car. The police ordered Wells and the driver out of the car at gunpoint. Wells was wet, wearing *1237 clothing different than that described by Allen, but similar to what Officer Dominguez had seen on the unknown man an hour earlier. The police handcuffed Wells. A search of the car revealed $240 in cash. A pat down of Wells uncovered a crack pipe.
The state conceded below that the police stopped the car in violation of the Fourth Amendment of the United States Constitution.
After advising Wells of his Miranda rights, Detective James Kelly interviewed him at the police station. Wells told the detective that his name was "Carl Reese" and that he had stolen the $240 found in the car from his girlfriend Carla.
Kelly then called Carla at the phone number Wells gave him. Carla told the detective that Wells was supposed to be at work. She said he had taken $80 from her, not $240. She then asked about the location of her car. This was the first Kelly had heard about a link between Wells and a car. Carla said her car was a black Nissan Altima with a temporary tag in the back window. Carla also told the detective Wells's true name.
That night, Kelly radioed Sergeant Allen Brumley and told him about Carla's car. The sergeant found Carla's Altima across the street from the bank ATM machine in the parking lot of the Tropical Palms Motel.
At the police station the night of the arrest, victim Allen overheard Wells talking to Detective Kelly and he recognized Wells's voice as the voice of the person who robbed him.
The day after the robbery, Kelly went to the motel with a photograph of Wells looking for someone who might have seen Wells the night before. He knocked on apartment doors and found Eric Thompson. Thompson recognized a picture of Wells from "being in the area and that's it."
On the morning after the robbery, Officer Dominguez also went to the Tropical Palms Motel to look for a knife or clothing associated with the robber. He went to the motel because he knew that Brumley had located Carla's Altima in the parking lot. When he asked some motel residents about the car, they told him it belonged to a black male who hung around apartment 12. The motel manager told Dominguez that Eric Thompson was staying in apartment 12 and that he had seen Thompson with a black male. Dominguez obtained Thompson's driver's license number from the manager. Back at the police station, Dominguez ran the license and found that Thompson had active warrants from Palm Beach County. The warrants were for crimes unrelated to the ATM robbery. The officer then went off duty.
Dominguez started a new shift at 11:00 p.m. that night. He obtained a warrant for Thompson and went to serve it on Thompson at 3:00 a.m. Thompson answered the door and Dominguez arrested him.
Dominguez read Thompson the Miranda warnings. Then Dominguez began to question Thompson about the previous night's ATM robbery. He asked him about the black male who drove the black Altima parked outside Thompson's apartment. At first Thompson was evasive, but soon he said he knew the black male as "David" and admitted that David had been in his apartment.
Thompson described for Dominguez how Wells came to his apartment the night of the robbery and lit up a crack pipe. Wells asked Thompson to go with him to get more cash, but Thompson refused. Wells left the apartment alone. A short time later, he came back banging on the door *1238 for Thompson to let him in. When Thompson opened the door, Wells was soaking wet. Wells said he needed help finding his keys. He said he had fallen into a pond and lost them. Thompson looked outside and saw police lights. Due to his active warrants, Thompson told Wells that he wanted to avoid the police, so Wells was on his own. Wells asked him for some dry clothes. Thompson gave Wells a pair of dark slacks and a white t-shirt. Wells left a red t-shirt and slacks behind.
Thompson consented to a search of his apartment. Dominguez seized the clothing Wells had left in Thompson's room and a butcher knife from Thompson's sink. Having come to the scene to back up Dominguez, Sergeant Brumley overheard Thompson telling the officer that Wells had fallen into a puddle and lost his keys. Brumley found the car key at the bottom of the motel retention pond.
Wells filed a motion to suppress the evidence seized as a result of the illegal traffic stop. The circuit court granted the motion as to the items found in the car  the crack pipe and the $240 in cash. The court denied the motion as to all other matters including Carla's statements,[1] the car keys, all information about the Altima, Allen's stationhouse identification, and Thompson's testimony.
At the October, 2006 trial, victim Allen described the robbery and identified Wells in court. Dominguez told about finding Thompson and seizing the clothes and butcher knife. Knowles testified about finding the keys in the pond. Kelly found a yellow rain slicker cap or shower cap under Thompson's sink and determined that the pond key started the Altima. A witness testified that she had sold the Altima to Wells.
Thompson was the primary witness at trial  he described in detail what Wells did in apartment 12 before and after the robbery. Thompson stated that although he had other, unconnected charges pending against him, it was his decision to testify against Wells. Thompson testified that no one from the state promised him anything in exchange for his testimony. Thompson said that he was testifying voluntarily for the state and that his testimony was not being given based on any expectation of leniency:
I was told at under [sic] no time there's no deals being made or nothing. They asked me to give my testimony as a State, a State witness of the State of Florida. . . . I was told I wasn't going to give, get nothing for nothing.
The state concedes that the initial stop of the car in which Wells was a passenger violated the Fourth Amendment. Under the "fruit of the poisonous tree" doctrine, the exclusionary rule bars the admission at trial of physical evidence and live witness testimony obtained directly or indirectly through the exploitation of the police illegality. Wong Sun v. United States, 371 U.S. 471, 484-88, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). However, a court may admit such evidence if the state can show one of three exceptions to the exclusionary rule:
(1) an independent source existed for the discovery of the evidence, or (2) the evidence would have inevitably been discovered in the course of a legitimate investigation, or (3) sufficient attenuation *1239 existed between the challenged evidence and the illegal conduct.
Moody v. State, 842 So.2d 754, 759 (Fla. 2003) (internal citations omitted).
Focusing primarily on the admissibility of Thompson's testimony, the state contends that the attenuation doctrine applies because the causal connection between the illegal stop and Thompson's decision to cooperate and turn over physical evidence became "so attenuated as to dissipate the taint" of the illegality. See United States v. Ceccolini, 435 U.S. 268, 274, 98 S.Ct. 1054, 55 L.Ed.2d 268 (1978) (quoting Wong Sun, 371 U.S. at 487, 83 S.Ct. 407). The suppression of witness testimony must meet stricter standards than the suppression of physical evidence. In Ceccolini, the Supreme Court recognized that "since the cost of excluding live-witness testimony will often be greater, a closer more direct link between the illegality and that kind of testimony is required." 435 U.S. at 278, 98 S.Ct. 1054. Thus, "[t]he exclusionary rule should be invoked with much greater reluctance where the claim is based on a causal relationship between a constitutional violation and the discovery of a live witness than when a similar claim is advanced to support suppression of an inanimate object." Id. at 280, 98 S.Ct. 1054.
In Ceccolini, the Supreme Court set forth an analytical framework to evaluate the admissibility of live witness testimony under the attenuation doctrine. The Court emphasized that live witness testimony should be excluded when "the basic purpose of the exclusionary rule will be advanced by its application" in a particular case. Id. at 276, 98 S.Ct. 1054. Two crucial considerations are the costs of permanently disabling a witness from testifying and the degree of free will exercised by the witness in testifying. Id. at 276-77, 98 S.Ct. 1054. The Court explained that where the cooperation of a witness is the result of the exercise of a person's free will, unaffected by police misconduct, the purpose of the exclusionary rule would not be served by disallowing the testimony. Id. at 276, 98 S.Ct. 1054. To determine whether a witness's testimony is sufficiently attenuated from the illegal conduct to be admissible, Ceccolini directs a court to consider: "(1) the stated willingness of the witness to testify; (2) the role played by the illegally-seized evidence in gaining the witness' cooperation; (3) the proximity between the illegal behavior, the witness' decision to cooperate and the actual testimony at trial[,] and (4) the police motivation in conducting the search." United States v. Hooton, 662 F.2d 628, 632 (9th Cir.1981).
Here, the record reflects that Thompson testified willingly at trial. Officer Dominguez did not threaten him to obtain his cooperation; his statements to the officer were voluntarily given. The state did not secure Thompson's participation at trial by offering something in return in this case or in his unconnected charges. Thompson did not testify as part of a plea bargain.
Concerning the second Ceccolini factor, the illegal stop of the vehicle played no role in securing Thompson's cooperation. Nothing seized from the car implicated him. "Tainted evidence from the [car] search was not used to coerce or induce" testimony from Thompson. Hooton, 662 F.2d at 632. If anything, it was the arrest on the outstanding warrants that led to Thompson's participation in this case. Initially, Thompson spoke to Detective Kelly, but he gave no information of value. After Officer Dominguez arrested him on the warrant, Thompson extensively detailed Wells' conduct before and after the robbery. The arrest on the warrant was an intervening event that broke the causal connection with the illegal vehicle stop. In *1240 a different context, the Florida supreme court has held that an outstanding arrest warrant can be an intervening circumstance that attenuates the connection between an unlawful traffic stop and a search incident to the driver's arrest on the warrant. See State v. Frierson, 926 So.2d 1139 (Fla.2006).
Thompson first spoke to the police about 24 hours after the illegal search and he testified at trial two years later. See United States v. Mergist, 738 F.2d 645, 648 (5th Cir.1984) (indicating that lapse of two years between illegal interrogation and trial testimony supported finding of attenuation). A short time span between the illegal stop and Thompson's statement to Officer Dominguez does not preclude a finding of attenuation where the witness was not the one stopped and was not coerced or influenced by the police misconduct. See United States v. Brookins, 614 F.2d 1037 (5th Cir.1980).
The fourth Ceccolini factor weighs against a finding of attenuation. The police illegally stopped the car looking for evidence of the ATM robbery and not for some other reason.
Weighing these four factors, we find that the trial court's refusal to suppress Thompson's testimony was supported by three of the four Ceccolini considerations. The police misconduct played no role in gaining Thompson's willing cooperation. Thompson's consent to a search of his apartment was an intervening circumstance that broke the chain of events that began with the stop, so that the items taken from the apartment were sufficiently attenuated from the illegal stop for the state to offer them in evidence at the trial. Florida courts have held that a defendant's own voluntary decision can be an intervening circumstance between an illegal stop and the recovery of evidence by the police. For example, in Reilly v. State, 557 So.2d 1365 (Fla.1990), after a defendant was illegally arrested, he made incriminating statements to inmates. The supreme court held that intervening circumstances  attendance at a first appearance, representation by an attorney, and a visit from parents  rendered the statements admissible at trial. See also Sanchez-Velasco v. State, 570 So.2d 908 (Fla.1990); State v. Stevens, 574 So.2d 197 (Fla. 1st DCA 1991); Wimberly v. State, 393 So.2d 37 (Fla. 3d DCA 1981). It follows that a third party's consent to a police search is also an intervening circumstance that purges the taint of the illegal search. See Williams v. State, 640 So.2d 1206 (Fla. 2d DCA 1994).
We agree with Wells that the trial court should have suppressed evidence pertaining to the Altima, which the police located before they found Thompson, closer in time to the illegal search. However, the evidence of the Altima was harmless beyond a reasonable doubt; it served only to place him in the general area of the bank ATM.
Affirmed.
WARNER and FARMER, JJ., concur.
NOTES
[1] At trial, Detective Kelly did not testify about (1) talking to Wells at the police station and (2) his conversation with Carla where he learned about Wells's real name and the Nissan Altima. Officer Dominguez testified that the Altima was brought to his attention, but did not explain how it led to his discovery of Thompson.