

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

|  |  |  |
|---|---|---|
| | § | |
| JUAN ANTONIO GONZALEZ, | | No. 08-14-00293-CR |
| | § | |
| Appellant, | | Appeal from |
| | § | |
| v. | | 346th District Court |
| | § | |
| THE STATE OF TEXAS, | | of El Paso County, Texas |
| | § | |
| Appellee. | | (TC # 2020D05048) |
| | § | |

## **O P I N I O N**

Appellant was indicted for the capital murder of a police officer. He was convicted of the lesser charge of murder, indicating that the jury did not believe the State proved beyond a reasonable doubt either that the police officer was killed during the performance of his duties, or that Appellant knew the decedent to be a police officer (or possibly both). Appellant raises fifteen issues challenging the murder conviction. We reverse the judgment of conviction and remand for a new trial because of the erroneous admission of evidence in the guilt innocence phase.

## FACTUAL SUMMARY

This case arises from an incident involving the decedent (twenty-eight-year-old policeman Jonathan Molina) and three youths (Juan Gomez, Alan Medrano, and Appellant). The incident occurred while the youths were walking along the sidewalk of a busy residential street, and Gomez was claimed to have "keyed" several parked vehicles, including that of the decedent.

Molina emerged from his residence and first confronted Gomez of keying his car. As we describe in more detail below, the encounter escalated into a fight, during which Officer Molina was taken down by Appellant and in the process struck his head on the sidewalk. The blow led to a fatal brain injury. The details of what occurred that day were presented through two of the three youths, several passersby, and through Appellant's later Facebook posts. We recount the differing versions of events as testified to before the jury.

### The Passersby

Mario Ramos was driving westbound along Trowbridge Avenue the late afternoon of September 25, 2012, when he noticed two males involved in an argument. He pulled over about two or three houses down to observe through his side view mirror and watched for about two to three minutes. He noticed a teenager and older male face to face and apparently arguing. Two other teens were several feet back and one was motioning as if to gesture, let's leave. The teenager engaged in the argument took a couple of steps towards the older man, causing him to move backward a few steps. Ramos saw the teenager punch the older male.[1] He agreed that he lost sight of both men while he parked his vehicle, and because the teen had his back to Ramos, he did not have an unobstructed view of the older male. Both the teen and the older male then fell. About ten seconds later, the three teens began walking away, and later broke into a run.

---

[1] In a statement to the police, Medrano wrote, "I did not see either of them hit each other" but at trial he explained that statement only pertained to what happened after both the teen and older male had fallen down.

The teen who was involved in the actual fight was the tallest of the three teens. Mr. Ramos circled around with his car, saw that the older male was on the ground apparently seizing, and he called 911. Later at the police station, Mr. Ramos picked out a picture of Appellant as one of the teens, but qualified the identification: Appellant was "one of the guys that was in the group but not sure [sic]."

Laura Mena was also westbound on Trowbridge that afternoon. She saw a confrontation between three younger males and one older male. She made a U-turn and by the time she parked and exited her car, the three younger males were already walking down the street. The older male was on the ground apparently seizing and she also notified 911. She called out to the youths to come back, but the tallest of the three threw his hand up in the air and pointed his index finger skyward.

Erin Lile was driving eastbound on Trowbridge at that time. She saw what looked like an after school fight. Two males were in close proximity and facing each other in an apparent verbal confrontation. She continued to observe as she passed by, and was eventually looking at the events through her rear view mirror. She saw arm movements, and the two broke away from each other, separating apart in distance. The younger male then "bum rushed" the older man, which Lile described as one person running into the chest of another. This lifted the older man off his feet and forced him to the ground. She then saw the younger man get on top of and "pummel" the older man (which she described as punching him in the face repeatedly). She made a U-turn and stayed at the scene until the police arrived. The older man was making a snoring sound, but was attempting to get up. His forehead was knotted up and his whole face was "blown up." She also saw the three youths leave the scene.

## The Participants' Version of Events

The three younger males referenced above were Appellant, then age 17, Tony Gomez, age 18, and Alan Medrano, age 19. Appellant stood 6'2" and easily was the tallest of the three. The older male was El Paso Police Officer Jonathan Molina.[2] He was six feet tall and weighed 275 pounds. At trial, Medrano testified for the State as a hostile witness. As we note below, his trial testimony strayed at times from a written and videotaped statement that he gave shortly after the incident. Appellant also testified to the events of that day. Tony Gomez invoked his right not to incriminate himself and was never questioned in front of the jury. We recount Medrano and Appellant's testimony as presented to the jury.

*Alan Medrano*

Alan Medrano, Tony Gomez, and Appellant were walking home from school and were all friends. As they were walking along the sidewalk on Trowbridge, Medrano noticed that Gomez had a piece of metal and was scratching a car. Gomez scratched another car, which turned out to belong to Officer Molina. As they were crossing the street, Officer Molina came out of a house and yelled at them to come back. Medrano originally told the police that Officer Molina was yelling "Hey bro." The three ignored him and kept walking.

When they were in the next block down, Officer Molina then pulled up beside them in his car. Officer Molina confronted Gomez, saying "What's up, now, bitch? Why are you scratching my car?" Gomez denied he did so and the two argued until Officer Molina started to curse at Gomez, referring to him as a "little kid" and a "fag." While both Appellant and Medrano

---

[2] Officer Molina was not in uniform and according to the testimony did not immediately identify himself as a police officer. There was considerable dispute below as to whether Officer Molina was in the performance of his duties, and whether Appellant knew Officer Molina to be a police officer, both of which were predicate elements for the capital murder charge. TEX.PENAL CODE ANN. § 19.03(a)(1)(West Supp. 2016). The jury did not return a guilty verdict on the capital murder charge and whether the officer was or was not killed in the performance of his duties is not before us. We refer to Jonathan Molina as "Officer Molina" only as an aide to the reader in keeping the parties straight.

4

testified that Officer Molina used the word "fag" (and Appellant also recalled using the word "faggot"), Medrano's statements to the police never included that pejorative. Officer Molina continued to accuse Gomez of scratching his car and Gomez continued to deny it, and the two got closer and closer.

Appellant then got in between Officer Molina and Gomez. Appellant first tried to calm the situation by telling Officer Molina to "chill out."[3] But they started arguing and got progressively closer to each other. At one point, Officer Molina told Appellant and Medrano to leave, but Appellant replied that it was a public sidewalk. As the argument progressed, Officer Molina then identified himself as a police officer but when Appellant asked to see a badge, Officer Molina responded, "I don't have to show shit."

The argument continued with Officer Molina and Appellant being about three inches from each other, nose to nose, until Officer Molina pushed Appellant with his shoulder. Medrano also testified that Appellant responded immediately by hitting Officer Molina. But at trial Medrano also testified, consistent with his earlier police statement, that Officer Molina had turned his attention away from Appellant and began to yell at Gomez, when Appellant "hit him, because he got mad."

Medrano testified that after being hit, Officer Molina raised his hands "like he was ready to fight" and Appellant hit him again. Medrano had not mentioned Officer Molina putting up his fists in his police statement. Then according to Medrano, Appellant took Officer Molina down by "kind of trip[ing] him." As Medrano explained it: "That's when [Appellant] picked him up from the legs and dropped him." The take down was further described as a tackle.

---

[3] He was also reported to say, "Calm down, dude, you know, like, we don't want to have any problems"; "You are coming and cussing at us saying that we did this, and we didn't do anything"; "calm down"; and "chill the fuck out."

5

When Officer Molina fell to the ground, Appellant fell next to him and then got on top, punching Molina two or three times in the face. Medrano testified that Officer Molina was putting his hands up as Appellant was hitting him but his earlier statement had also not mentioned that fact. When Officer Molina stopped responding, or possibly at the urging of his friends, Appellant broke off and stood up. Medrano had told the police that Officer Molina looked "stiff" and was just lying there with his eyes closed.

The three youths walked to end of the block, ignoring the call of someone to come back, and then they started to run. Medrano testified that Appellant was "really, really mad," as Officer Molina had "really pissed [him] off." Appellant had complained to Medrano that Officer Molina was yelling at him for no reason, was cussing at him, was not his father, and was "no one to be yelling at him like that." Medrano was apprehended by the police within ten minutes of the event.

*Appellant's testimony*

Appellant similarly described walking home from school with his friends. As they were walking along Trowbridge, he claimed that Officer Molina came out of his house and first called out, "You fucking faggots." The three youths ignored him and kept walking. Officer Molina thereafter pulled up alongside them in his car, got out appearing "very angry", and yelled at Gomez, "Hey, you fucking faggot". . . Why the fuck did you scratch my car?"

Appellant also recalled that Gomez denied doing anything and Gomez and Officer Molina began arguing eventually getting about an arm's length apart. The argument grew heated with continued use of profanity. At that point, Appellant stepped in and pulled Gomez back, telling both to "calm down."

6

Officer Molina then turned to Appellant and started "cussing" at him.[4]  Appellant then said let's just go home.  He felt Officer Molina was "real aggressive" making comments and threats that caused Appellant to be afraid for himself and his friends.  Even though Appellant was the taller of the two, Officer Molina was considerably stockier.  Appellant agreed he also got upset and used "vulgar" language.[5]

The two had gotten within inches of each other and Officer Molina was saying, "Get out of here.  Get the fuck out of here.  You have nothing to do here.  This is not your business.  Just leave, you little punk."  At that point, Officer Molina first mentioned that he was a police officer, prompting Appellant to ask to see his badge.  Officer Molina said, "I don't have to show you shit" and said to an older woman who was witnessing the exchange from a nearby porch that she should "call the cops."[6]  The argument continued and Appellant told Officer Molina that he was 17 years old and "you can't hit me" to which Officer Molina supposedly responded, "I don't care how old you are, I could kick your ass and the rest."  Appellant claimed that Officer Molina then shoved him with his right hand.  Appellant responded immediately by hitting Officer Molina twice.

Upon seeing Officer Molina's expression after the punches, Appellant got more scared and grabbed him and pushed him to the ground.  He described the take down as grabbing "him from the legs and then [I] just pushed him to the floor."  They both went down and Appellant fell on top of Officer Molina who was using his legs to kick Appellant off.  Appellant hit Officer Molina twice who then "stopped fighting back."  The entire fight lasted no more than ten

---

[4] "He engages with me.  He starts cussing at me asking me, Who am I?  Who the hell do I get to tell him what to do?  Who the fuck am I?  What am I doing there?"  He was also claimed to say "Fuck you.  You bitch.  Get the hell out of here."

[5] We include the vulgarity of the comments to demonstrate the escalation of the argument.

[6] The woman did not testify as she passed away before trial.

7

seconds. The teens then walked away, but by the time they got the end of the street, they heard someone was going to call the police, and they broke into a run.

Appellant testified that when got up and left the scene, it looked like Officer Molina was trying to get up and gather himself. In a Facebook message that Appellant sent later that evening, however, he described Officer Molina as "twitching and bleeding." This latter description was likely more correct. Officer Molina had a severe contusion to the back of the head consistent with an uninterrupted fall. The fight took place in an area where the concrete was irregular, having bumps, cracks, and a place where it jutted up like a teepee. Officer Molina's skull was fractured from the back extending over the skull cap to the left frontal area. He suffered a contra-coup brain injury; the immediate impact injured the rear part of the brain and the frontal lobes were injured as the brain rebounded forward. Officer Molina died ten days later from a subarachnoid hemorrhage that lead to brain swelling which shut down his other bodily functions. Dr. Juan Contin, the medical examiner, testified that any injuries from the punches had nothing to do with cause of death, but the blow to the back of the head was an unsurvivable injury.

Appellant told the jury he never meant to kill Officer Molina, and that he only got in the fight because he feared for himself or his friends. The State also elicited some additional background testimony about Appellant. When Medrano was fourteen or fifteen years old, he had trained five or six months at a boxing gym and had passed along some of his knowledge to Appellant. Conversely, Appellant had showed Medrano a few judo moves he learned years before from two to three months of classes that he had taken. One of the moves involved taking a person down by grabbing their legs, picking them up, and using their own force against them. The two would practice and teach each other these skills two to three times a week.

*The Facebook Messages*[7]

In the guilt innocence phase of the trial, the State admitted a number of messages that Appellant sent and received on day of the incident. Over Appellant's objections which we discuss below, the State admitted a series of messages that relate to drug possession and use. That morning, Appellant was messaging with his girlfriend while he was apparently in class. At 10:32 a.m. he messaged her that he was "rollin at school" which apparently meant that he had taken an ecstasy pill. His girlfriend then asked if it was "with our pills" to which he replied, "no, with my extra one." At 10:44 a.m. he messaged her that he was "shaking" and then "it's starting to hit me." He then messaged her that "I don't wanna roll in class" and that he trips "bad at school" but was saving two pills that they could use later. At 10:50 a.m. he messaged "Oh, God, babe stay with me. I'm starting to trip bad." The last message sent at 10:58 a.m. reads: "I only freak out at school other than that I'm fine" Later that evening he messaged his girlfriend that he was going to "flush our pills."

The State also admitted a series of messages sent and received the evening of the incident. Appellant had made it back to an uncle's apartment that afternoon. He messaged his girlfriend that he might go to jail because he and "two friends walked home and this guy starting talking shit to us, and at first I told him to back off and he pushed me so I punched him, then tackled him, then punched him again . . . ."[8] He told his girlfriend they ran when they saw the man twitching and bleeding. As he heard news accounts of the event, he also messaged

---

[7] We set out many of the posts in this opinion and to avoid distraction, we have chosen to omit the many signals that would ordinarily be used to denote original grammatical, punctuation, and spelling errors. The original exhibit was produced from Facebook in a form showing the author, recipient and date of the message as well as the text message. Some of the messages also included "emojis" but they are represented by specific key strokes, such as >.< and (/.\). Neither party has placed any significance of the emojis and we have accordingly not reproduced them in this opinion.

[8] He also messaged his girlfriend that "It's not my fault tho he was like 30 and twice my size, me either babe I'm really really really scared" and "I shouldn't have hit him, I don't know what I was thinking."

Medrano, who by this time was in police custody, that: "I hope u didn't get caught I killed the guy, he went into compulsions and died." He claims he sent this message after he had heard on the news that Officer Molina had passed, but when later news accounts reported he was alive at the hospital, Appellant messaged Medrano that: "Haha jk Weii I seen that shit on the news" and "Dude turn on the news dude there's all this crap going on." Appellant claimed that he was going to turn himself the next day, but the police located and arrested him at 3:00 a.m. the next morning.

The jury was given the choice to convict or acquit Appellant on capital murder, murder, manslaughter, or criminally negligent homicide. The charge included Appellant's theory of self-defense. The jury found Appellant guilty of murder. Following punishment phase testimony, the jury assessed a fifty-year sentence.

## ISSUES ON APPEAL

Appellant raises fifteen issues challenging the murder conviction. One series of issues seek a remand for a new trial based on claimed errors in voir dire, the admission of evidence, the charge, and closing argument.[9] The remaining issues are legal insufficiency of evidence points that could result in a judgment of acquittal. Issue Two claims the evidence is legally insufficient to support the jury's finding for intentional and knowing murder. Issue Three challenges the legal sufficiency of the evidence to support a murder conviction under the serious-bodily-injury theory. Finally, Issue Four contends the State failed to disprove Appellant's self-defense theory beyond a reasonable doubt.

---

[9] Specifically, Issue One claims error from restrictions on Appellant's voir dire. Issues Five and Six claim the trial court erred by including a serious-bodily-injury theory of murder in the charge. Issue Seven claims error from the trial court allowing a number of uniformed foreign military visitors to sit in the courtroom during closing argument, and Issue Eight complains that the courtroom itself had plaques lauding the branches of the United States military (the decedent was a veteran). Issues Ten, Eleven, and Twelve complain of improper closing argument by the State's attorney. Issues Thirteen and Fourteen complain of the admission of the drug evidence in the guilt innocence phase, and Issue Fifteen claims cumulative error.

The jury had four options. It could have, but declined to convict Appellant on the primary charge of capital murder. It convicted him of the next most serious lesser included offense: murder. The jury had also had the option to convict on two other lesser included offenses: manslaughter and criminally negligent homicide. Were we to conclude that the evidence is legally insufficient to support the murder conviction, rather than acquit Appellant, we could reform the judgment to the next highest lesser included offense for which the evidence might be legally sufficient. *Bowen v. State*, 374 S.W.3d 427 (Tex.Crim.App. 2012)(overruling prior case law and allowing reformation even when no lesser included offenses were asked for or submitted). In fact, we have a duty to consider that option. *Thornton v. State*, 425 S.W.3d 289 (Tex.Crim.App. 2014). It might of course be that the evidence could be insufficient to support the *mens rea* for any of the lesser included offenses in a murder case. *Britain v. State*, 412 S.W.3d 518, 521 (Tex.Crim.App. 2013)(court of appeals did not err in failing to reform a judgment to a lesser-included offense when the evidence would not support *mens rea* for any lesser included charge). But even in a murder case where the sufficiency challenge involves a culpable mental state, we should consider each lesser included offense available. *Stobaugh v. State*, 455 S.W.3d 165, 166 (Tex.Crim.App. 2015)(Keller, J. dissenting from denial of pet. rev.)(suggesting that court of appeals had obligation to consider whether evidence supported *mens rea* for lesser included offenses of manslaughter).

Ordinarily, we would consider the legal insufficiency issues first, for if we sustained the point, the defendant would be acquitted and there would be no need to consider remand points. In this case, we first consider whether the State failed to carry its burden on self-defense, for it failed, we would then acquit the defendant. Whether he had the *mens rea* for any lesser included offenses would be irrelevant. We do so, and conclude the State met its burden. But we defer

11

formally ruling on Appellant's two other legal sufficiency challenges to the murder verdict for one simple reason. On this record, even if we sustained Appellant's sufficiency challenges to murder, we would reform the judgment to reflect a conviction for at least one of the lesser included offenses below murder. We would then remand for a new sentencing hearing. But we have also concluded that one of the new trial points is meritorious and requires a retrial on guilt and innocence. Accordingly, our review of the legal sufficiency points for the *mens rea* for murder would be unnecessary.

With that foreshadowing, we first discuss the sufficiency of the evidence to support the rejection of the self-defense claim (which might result in a complete acquittal). We then discuss the new trial issue that requires reversal and remand. Finally, we briefly discuss why the evidence would necessitate at least a reformation to one of the lesser included offenses (manslaughter or criminally negligent homicide) which as we explain makes formal resolution of Issues Two and Three advisory.

## SUFFICIENCY OF THE EVIDENCE
## FOR SELF-DEFENSE

In Issue Four, Appellant contends the evidence is legally insufficient to support the conviction because the State failed to prove he was not acting in self-defense.[10]

### *Standard of Review*

Our legal sufficiency standard is articulated in *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). *See Brooks v. State*, 323 S.W.3d 893, 894-95 (Tex.Crim.App. 2010)(finding no meaningful distinction between the legal and factual

---

[10] In a footnote, the State claims that all the legal sufficiency issues are forfeited because they were inadequately briefed. The State concedes that Appellant has set out legal authorities with the appropriate standard of review, but faults Appellant for failing to cite any legal authorities in his argument under each issue. While the resolution of legal insufficiency challenges from other reported cases can certainly be helpful, each case is ultimately based on its own facts. *Sadler v. State*, 364 S.W.2d 234, 238 (Tex.Crim.App. 1963). We decline to hold Appellant forfeited the challenge simply because he elected not to cite to that authority.

sufficiency standards and applying *Jackson v. Virginia* as the only standard in Texas). The relevant inquiry is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 318-19, 99 S.Ct. at 2789. [Emphasis in original].

Under the *Jackson* standard, the jury is the sole judge as to the weight and credibility of evidence. *Brooks*, 323 S.W.3d at 894-95. If the record contains conflicting inferences, we must presume the jury resolved such facts in favor of the verdict and defer to that resolution. *Id.* Circumstantial evidence is as probative as direct evidence in establishing guilt, and circumstantial evidence alone may be sufficient to establish guilt. *Carrizales v. State*, 414 S.W.3d 737, 742 n.20 (Tex.Crim.App. 2013), *citing Hooper v. State*, 214 S.W.3d 9, 13 (Tex.Crim.App. 2007). Not every fact needs to point towards guilt; it is enough that the combined and cumulative force of the evidence supports the verdict. *Johnson v. State*, 871 S.W.2d 183, 186 (Tex.Crim.App. 1993). On appeal, we serve only to assure that the jury reached a rational verdict; we may not reevaluate the weight and credibility of the evidence, nor may we substitute our judgment for that of the fact finder. *King v. State*, 29 S.W.3d 556, 562 (Tex.Crim.App. 2000).

*Self-Defense*

Appellant's fourth issue contends that the evidence was insufficient to support the jury's rejection of his self-defense theory. The flaw in Appellant's reasoning, however, is that his defense turns on disputed factual assertions and the jury is the sole judge of credibility and weight to be given to the testimony. *Brooks*, 323 S.W.3d at 894-95; *Jackman v. State*, 08-14-00176-CR, 2016 WL 4538533, at *6 (Tex.App.--El Paso Aug. 31, 2016, no pet. h.).

13

Here, the jury was presented with two opposing versions of events. Under one version, Appellant claimed to be afraid of an aggressive Officer Molina who pushed him first, resulting in an immediate responsive punch. And fearing Molina's response to this first punch, Appellant then tackled him to the ground. This event was preceded by Officer Molina's use of offensive language, and explicit boasts he could "kick your ass and the rest." But the jury also had facts before it that suggested that Officer Molina's language was not as Appellant claimed. The record contains one account that Officer Molina broke off his argument with Appellant and redirected his attention to Gomez who was several feet away. Only then did Appellant strike Officer Molina when he was looking away. A passerby offered another version that had Appellant initiate the first physical contact. The jury chose to disbelieve Appellant's version, and in doing so, it may have reconciled any inconsistencies in the evidence in favor of the guilty verdict. We overrule Issue Four.

**EXTRANEOUS EVIDENCE OF DRUG USE**

In Issue Thirteen, Appellant complains of the admission of evidence that he took ecstasy the day of the confrontation. In Issue Fourteen, Appellant complains of the admission of evidence that he had ecstasy pills in his possession that day.

The evidence was admitted during the guilt-innocence phase of the trial while Appellant was testifying in his case in chief. The evidence came in through several Facebook messages from the day of the incident. As we noted above, Appellant took one pill sometime prior to 10:32 a.m. when he messaged his girlfriend that he was "rollin at school." His girlfriend then asked if it was "with our pills" to which he replied, "no, with my extra one." At 10:44 a.m. he was "shaking" as "it's starting to hit me." At 10:50 a.m. he messaged "Oh, God, babe stay with me. I'm starting to trip bad." He assured his girlfriend that he was saving two pills that they

14

could use later. The last message before the incident was sent at 10:58 a.m. and reads: "I only freak out at school other than that I'm fine."

Appellant got out of school at 3:45 p.m. and he and his friends first went to check on a car at a mechanic shop before walking home. He denied that he was still under the influence of the ecstasy at the time of his encounter with Officer Molina. The exact time of the fight is unclear. One of the passersby believed it was between 5:00 p.m. and 6:00 p.m. Another put the events between 4:30 p.m. and 5:00 p.m. The time gap between taking the pill the incident was therefore anywhere between six and seven hours.

Appellant's counsel objected to the Facebook exhibit, and questions related to it, under Rule 401 (lack of relevance), Rule 403 (prejudice outweighing relevance), and Rule 404(b)(prior bad acts). The trial court overruled the objections and allowed the Facebook exhibit, and Appellant was cross-examined on his taking and possessing ecstasy that day.

*Standard of Review*

We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *Martinez v. State*, 327 S.W.3d 727, 736 (Tex.Crim.App. 2010). The trial court will be overturned only if it's ruling is so clearly wrong as to lie outside the zone of reasonable disagreement. *Taylor v. State*, 268 S.W.3d 571, 579 (Tex.Crim.App. 2008); *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex.Crim.App. 1990)(op. on reh'g). We may not substitute our own decision for that of the trial court. *Moses v. State*, 105 S.W.3d 622, 627 (Tex.Crim.App. 2003).

Here we deal with evidence of an extraneous offense--use and possession of a controlled substance. A trial court's ruling on the admissibility of an extraneous offense evidence is generally within this zone of reasonable disagreement if it (1) is relevant to a material, non-

15

character conformity issue, and (2) the probative value of that evidence is not substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading of the jury. *De La Paz v. State*, 279 S.W.3d 336, 344 (Tex.Crim.App. 2009).

*Relevance and Evidence of Bad Acts*

In deciding whether a particular piece of evidence is relevant, a trial court judge should ask "would a reasonable person, with some experience in the real world believe that the particular piece of evidence is helpful in determining the truth or falsity of any fact that is of consequence to the lawsuit." *Montgomery*, 810 S.W.2d at 376, *quoting United States v. Brashier,* 548 F.2d 1315, 1325 (9th Cir. 1976). If the trial court believes that a reasonable juror would conclude that the evidence alters the probabilities of contested events to any degree, the evidence is relevant. *Id.* Relevant evidence is generally admissible, while that which is not, is not. TEX.R.EVID. 402.

In criminal cases, we are also guided by Rule 404(b)(1) which commands that evidence of other crimes or bad acts is not admissible to show character conformity. TEX.R.EVID. 404(b)(1). But that kind of evidence might be admissible for some other non-character-conformity purpose, such as showing motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. *Id.* Admitting evidence under Rule 404(b)(2) is conditioned, however, on the State providing proper advanced notice of its intention to use such evidence in its case in chief. *Id.* at 404(b)(2).[11]

---

[11] Part of Appellant's argument is that he was not given notice of the State's intent to use this testimony. On timely request, the State must give notice of its intent to introduce this kind of evidence "in the same manner required by Rule 404(b)." TEX.CODE CRIM.PROC.ANN. art. 37.07§3(g)(West Supp. 2016). Rule 404(b)(2) in turn requires the State to provide the defendant notice for any such evidence that it intends to use in its "case in chief." The Facebook messages at issue here were all introduced during the cross-examination of Appellant during the defense case in chief, and therefore Appellant's notice argument fails. *See Jaubert v. State*, 74 S.W.3d 1, 4 (Tex.Crim.App. 2002)("The extraneous offense evidence in this case was introduced during cross-examination and rebuttal testimony, not in the State's case-in-chief. Therefore, appellant was not entitled to notice of the extraneous offenses."). We need not reach the State's other argument that it provided proper notice by serving a notice of intent

*Rule 403 Balancing*

Appellant also objected on Rule 403 grounds. Relevant evidence is generally admissible, but it is properly excluded under Rule 403 when its probative value is substantially outweighed by the danger of unfair prejudice. TEX.R.EVID. 403; *Casey v. State*, 215 S.W.3d 870, 879 (Tex.Crim.App. 2007). "Virtually all evidence that a party offers will be prejudicial to the opponent's case, or the party would not offer it. Evidence is unfairly prejudicial only when it tends to have some adverse effect upon a defendant beyond tending to prove the fact or issue that justifies its admission into evidence." [Citations omitted]. *Id*. at 883.

In conducting a Rule 403 balancing test, the trial court must consider (1) the inherent probative value of the evidence and (2) the State's need for that evidence against (3) any tendency of the evidence to suggest a decision on an improper basis, such as emotion, (4) any tendency to confuse or distract the jury from the main issues, (5) any tendency to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or be needlessly cumulative. *Gigliobianco v. State*, 210 S.W.3d 637, 641-42 (Tex.Crim.App. 2006) (noting these factors as a refinement to a four factor test appearing in prior cases). In practice, these factors may well blend together. *Id*.

*Analysis*

Under this rubric, was evidence of Appellant's use of ecstasy some six hours before the murder relevant to any issue in the case? The State says yes because it allowed the jury to better evaluate Appellant's claim of self-defense. If he was still intoxicated at the time of the confrontation, his perception of reality, recall of events, decision making process for the use of

---

to use the Facebook records, with the records attached, well in advance of trial.

force, and his state of mind might all be affected. We do not disagree with the general proposition that if there were evidence of intoxication, it might be germane to those issues.

The problem is that the record contains nothing but supposition that the ecstasy pill that Appellant took sometime before 10:32 a.m. had any effect on him some six hours later when the confrontation occurred. The Facebook messages support that Appellant still had some ill effect from the drug at 10:50 a.m., but there were no posts after that time. Appellant denied being under the influence at time of the confrontation. The effects of a drug are likely a function of the dose and the pharmacology of the particular substance. There was some mention of dose (one pill) but absolutely no evidence of the half-life of ecstasy in the body or the length of its effects. For that matter, there was no evidence of the actual effects of the drug on the mind, either during use, or after the user has come down. A few minutes after ingesting the pill, Appellant was "tripping bad" and "shaking" but he was never asked exactly what those terms meant.

The State counters this argument with several cases which it contends stand for the proposition that no such predicate is required. The cases cited fail to convince us of this proposition. In *Adams v. State*, No. 13-01-340-CR, 2002 WL 31412530, at *2 (Tex.App.-- Corpus Christi, Oct. 24, 2002, pet. ref'd)(not designated for publication) the defendant was charged with aggravated assault, and as here, claimed self-defense. He claimed that the complaining witness was intoxicated and he was able to cross examine her on smoking crack cocaine on the day of the assault. The opinion states that use of crack cocaine or alcohol "around the time of the altercation is relevant." *Id* at *2. At another point, the opinion makes the same statement about use of those drugs "on the day of the altercation." *Id*. But the actual issue on appeal was the denial of the defendant's ability to develop testimony about drug use prior to the

18

day of the event. *Adams* simply never addressed the predicate for admission of drug use on the day of the event.

In *Newman v. State*, No. 11-01-00066-CR, 2001 WL 34375770, at \*1-2 (Tex.App.--Eastland, Nov. 15, 2001, no pet.)(not designated for publication) the trial court admitted evidence that the defendant had consumed alcohol and marijuana two hours prior to the murder, along with witness testimony that he was a "little drunk" at the time. *Id.* We have no quarrel with the court's conclusion that the evidence was relevant to the self-defense claim being made, or that a jury might use its own common sense and understanding to gauge the effects of alcohol or marijuana within a two-hour time span. The question here is whether a jury has a similar understanding of a less common drug--ecstasy--taken some six hours earlier when there was no direct testimony that Appellant was still under its effects.

Finally, the State relies on *Hosmer v. State*, No. C14-89-01050-CR, 1990 WL 183472, at \*3 (Tex.App.--Houston [14th Dist.], Nov. 29, 1990, pet. ref'd)(not designated for publication) for the proposition that whether the intoxicating effects of the drug would have been present at the time of the offense is a matter that goes to the weight of the evidence. But in *Hosmer*, the defendant admitted in a prior statement and grand jury testimony that he was intoxicated at the time of the incident. *Id.* In all, none of these cases supports the view that a jury can be given free rein to speculate as to the effect of a particular drug, or how long it affects the mind, and in what way. We agree that there might be certain intoxicants from which a jury's common experience might fill in some of these gaps, or there may be time periods of such short duration that an inference of continued intoxication might be justified. This case presents neither.

Without any indication that Appellant was still under the effects of ecstasy at the time of the incident, or really any indication of what those effects may have been, the evidence fails the

19

basic relevance test. But even if there were some slight relevance, it would be substantially outweighed by the danger of unfair prejudice under TEX.R.EVID. 403. As presented, the ecstasy evidence had no, or at least very little probative value in rebutting Appellant's claim of self-defense, and thus the State had little need for this evidence. As such, the evidence did not go to a central issue in the case, but it does raise concerns for swaying a jury on an improper basis, distracting the jury, or permitting the jury to place undue weight on the evidence which it was ill-equipped to evaluate. Just apart from the use of drugs, Appellant was taking a drug while at school. The evidence suggested that Appellant was also in possession of other pills that he intended to use with his girlfriend. These aspects add additional layers of prejudice. We conclude that admission of the evidence in guilt innocence runs afoul of Rule 401, 403 and 404(b).

*Harmful Error?*

Ordinarily, error in the admission or exclusion of evidence is not of constitutional dimension. *Arzaga v. State*, 86 S.W.3d 767, 776 (Tex.App.--El Paso 2002, no pet.). We generally disregard non-constitutional error unless a "substantial right" of the appellant is affected. TEX.R.APP.P. 44.2(b); *Burnett v. State*, 88 S.W.3d 633, 637 (Tex.Crim.App. 2002). A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict. *Morales v. State*, 32 S.W.3d 862, 867 (Tex.Crim.App. 2000); *King v. State*, 953 S.W.2d 266, 271 (Tex.Crim.App. 1997). We should not reverse a criminal conviction because of non-constitutional error if we have fair assurance that the error did not influence the jury, or had but a slight effect. *See Morales*, 32 S.W.3d at 867; *Johnson v. State,* 967 S.W.2d 410, 417 (Tex.Crim.App. 1998).

In making this determination, we consider the entire record, including the jury instructions, the parties' theories of the case, and closing arguments. *Arzaga,* 86 S.W.3d at 776. We consider: (1) the character of the alleged error and how it might be considered in connection with other evidence; (2) the nature of the evidence supporting the verdict; (3) the existence and degree of additional evidence indicating guilt; and (4) whether the State emphasized the complained of error. *See Motilla v. State*, 78 S.W.3d 352, 356-58 (Tex.Crim.App. 2002).

We conclude the admission of the drug use (and possession evidence) affected Appellant's substantial rights. The character of the evidence is, and should be, disturbing to an average juror. That Appellant used an illicit drug while in school, communicated about it to his girlfriend, and planned to later use the drug with his girlfriend would place Appellant in a very poor light. We disagree with the State's assertion that this evidence was not "inflammatory nor emotionally charged." The parties dispute the State's emphasis on this evidence. The drug related questions comprise four pages of some twenty-nine pages of cross-examination. The State did not mention the drug use in closing argument, but several times referred the jury to other specific Facebook messages. The jury asked for all the exhibits to review, which would have included these messages.

The most important factor here is the nature of the evidence supporting the verdict and the other evidence of guilt. The details of what happened that day came in through several passersby who had a sometimes limited visual perception of the events, and who heard none of the conversation between Appellant and Officer Molina. Otherwise, the evidence came in through Alan Medrano, whose trial testimony was largely consistently with Appellant's, but whose earlier statements painted a somewhat different view. That left the jury with Appellant's testimony. His case rose or fell on his credibility. Suggesting that he was high on drugs would

21

certainly influence his credibility. This is not a situation such as *Smith v. State*, 08-05-00018-CR, 2006 WL 1710381, at *7 (Tex.App.--El Paso June 22, 2006, pet ref'd)(not designated for publication) where we found evidence of extraneous drug use harmless. In *Smith* two separate eyewitnesses supported the jury's finding of guilt on the centrally contested issue of fact. Here, the only eyewitnesses to the entire event were Appellant and Medrano, and if they were believed, a jury could have well returned a different verdict. Medrano's credibility was hampered to some degree by inconsistencies from his prior statement. Placing the imprimatur of drugs and drug use on Appellant's testimony could well have changed the jury's calculus.

We overruled Appellant's legal sufficiency challenge on self-defense not because the evidence of guilt was overwhelming, but largely because the evidence conflicts, and we must honor the jury's choice of which evidence to believe. But painting Appellant as high on drugs that day goes directly to the matter of who the jury was to believe. It may be on re-trial that the State can show that use of ecstasy six hours before the alleged crime affected Appellant's mood, perception, memory, or reactions. The State did not do so. We sustain Issues Thirteen and Fourteen.

## LEGAL SUFFICIENCY ISSUES ON MENS REA

By statute, a person commits criminal homicide if he intentionally, knowingly, recklessly, or with criminal negligence causes the death of an individual. TEX.PENAL CODE ANN. § 19.01(a)(West 2011). The jury found Appellant guilty of murder, meaning that they found he: (1) "intentionally or knowingly" caused the death; or (2) he intended to cause "serious bodily injury" through an act "clearly dangerous to human life that causes the death of an individual." TEX.PENAL CODE ANN. § 19.02(b)(1), (2)(West 2011).

Murder, under Section 19.02(b)(1) or (b)(2), is a "result of conduct" offense, which requires that the culpable mental state relate to the result of the conduct--that is--causing of the death. *See Cavazos v. State*, 382 S.W.3d 377, 384 (Tex.Crim.App. 2012)(so stating for Section 19.02(b)(2)); *Roberts v. State*, 273 S.W.3d 322, 328-29 (Tex.Crim.App. 2008)(so stating for Section 19.02(b)(1)); *see also Lugo-Lugo v. State*, 650 S.W.2d 72, 80-82 (Tex.Crim.App. 1983). A person acts "intentionally" with respect to a result of his conduct when it is his conscious objective or desire to cause the result. *See* TEX.PENAL CODE ANN. § 6.03(a)(West 2011). A person acts "knowingly" with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result. *Id*. § 6.03(b). Appellant attacks the legal sufficiency of the evidence to support his *mens rea* for committing the crime of murder.

As we alluded to earlier, we choose to not reach this issue because even if we agreed, we would find legally sufficient evidence for at least one of the lesser included crimes and we would not order Appellant's outright acquittal. A person commits manslaughter if he "recklessly" causes the death of an individual. TEX.PENAL CODE ANN. § 19.04(a)(West 2011). Recklessness in this context means the person "is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur." TEX.PENAL CODE ANN. § 6.03(c). A person commits criminally negligent homicide if they cause the death of an individual by "criminal negligence." TEX.PENAL CODE ANN. § 19.05(a)(West 2011). The mental state for that crime requires that the person "ought to be aware of a substantial and unjustifiable risk that the circumstances exist or the result will occur." TEX.PENAL CODE ANN. § 6.03(d). For both recklessness and criminal negligence, "[t]he risk must be of such a nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that

23

an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint." *Id*.

The State is not required to produce direct evidence of the requisite culpable mental state. *Hart v. State*, 89 S.W.3d 61, 64 (Tex.Crim.App. 2002). In fact, the requisite culpable mental state is almost always proved circumstantially. *See Hernandez v. State*, 819 S.W.2d 806, 810 (Tex.Crim.App. 1991)("[M]ental culpability is of such a nature that it generally must be inferred from the circumstances under which a prohibited act or omission occurs."). Accordingly, intent may be inferred from the acts, words, and conduct of the accused. *See Guevara v. State*, 152 S.W.3d 45, 50 (Tex.Crim.App. 2004); *Manrique v. State*, 994 S.W.2d 640, 649 (Tex.Crim.App. 1999). Intent can also be inferred from the extent of the injuries to the victim, the method used to produce the injuries, and the relative size and strength of the parties. *Patrick v. State*, 906 S.W.2d 481, 487 (Tex.Crim.App. 1995); *Duren v. State*, 87 S.W.3d 719, 724 (Tex.App.--Texarkana 2002, pet. struck). The jury may consider events occurring before, during, or after the offense. *Henderson v. State*, 825 S.W.2d 746, 749 (Tex.App.--Houston [14th Dist.] 1992, pet. ref'd).

We would easily conclude that the evidence was at least sufficient to support a verdict on criminally negligent homicide. Most relevant here is the circumstance of taking Officer Molina's legs out from underneath him on an irregular concrete surface. No doubt people are often tackled to the ground, or otherwise fall, and suffer little or no injury. The question here, however, is whether undercutting someone's feet in such a way that they might fall without the ability to brace themselves, and fall on a hard uneven surface, creates a substantial and unjustified risk to human life. We are not dealing with a student felled in a padded judo studio, or a gridiron running back who is protected by padding, and expecting a tackle. Given the

testimony here, undercutting a six-foot-tall person on an uneven concrete surface subjects the skull to over two hundred pounds of force, and as demonstrated by the actual injury here, can cause a grievous head injury. Added to that, Appellant then hit Officer Molina in the face while his head was against the ground. These actions raise at least an inference that Appellant exposed Officer Molina to a substantial and unjustified risk. In that regard, we would conclude that Appellant's acts were a gross deviation from the standard of care governing ordinary people. And while the evidence might also support one or more higher form of criminal homicide, it is enough for us to conclude that we would not outright acquit Appellant on this record.

## CONCLUSION

We overrule Issue Four. We sustain Issues Thirteen and Fourteen. We decline to consider the remaining legal insufficiency issues (Two and Three) and the balance of the new trial issues (One, Five, Six, Seven, Eight, Nine, Ten, Eleven, Twelve and Fifteen). The judgment of conviction is reversed and the cause is remanded for a new trial.

January 25, 2017

ANN CRAWFORD McCLURE, Chief Justice

Before McClure, C.J., Rodriguez, and Hughes, JJ.
Hughes, J., not participating

(Do Not Publish)